**Georgia J. LEWIS, Plaintiff,**

v.

**R. Max BLACKBURN, Original Defendant,**

**and**

**Frank W. Snepp, Jr., Additional Defendant.**

**No. C–C–82–565–M.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Jan. 13, 1983.

Supplemental Opinion Jan. 24, 1983.

---

George Daly, Charlotte, N.C., for plaintiff.

Millard R. Rich, Jr., Deputy Atty. Gen., North Carolina Dept. of Justice, Raleigh, N.C., and Jane S. Barkley, Legal Officer, Office of the Clerk of Superior Court, Charlotte, N.C., for defendants.

## MEMORANDUM OF DECISION AND FINAL ORDER

McMILLAN, District Judge.

### FINDINGS OF FACT

Plaintiff, Georgia J. Lewis, since August 14, 1978, has been one of a score or more of magistrates in the state court system for Mecklenburg County, North Carolina. Plaintiff is a college graduate, experienced in child welfare work, probation counseling and paralegal work. She was first appointed on August 14, 1978, to fill an unexpired term; she was reappointed for two years beginning January 1, 1979, and she was again reappointed on January 1, 1980, for a two-year term expiring December 31, 1982. Her recent service was as a civil court magistrate; with two others she shared a case load of about 22,000 cases a year (about 145 cases a week per judge). Her work has been satisfactory; until September 1982 there was no record of any dissatisfaction on the part of appointing authorities with her performance as magistrate.

Under General Statutes of North Carolina 7A–170, "a magistrate is an officer of the district court .... A magistrate possesses all the powers of his office at all times during his term."

Under Chapter 7A–171 magistrates are (a) *nominated* by the Clerk of the Superior Court; (b) *appointed* from the nominees by the senior resident Superior Court judge; and, in Mecklenburg County, they are (c) *supervised* by the chief district judge.

The defendant R. Max Blackburn is the Clerk of the Superior Court; the defendant Frank W. Snepp, Jr., is the senior resident Superior Court judge; and in the summer of 1982 Chase Saunders was the chief district judge and the supervisor of the plaintiff.

On September 8, 1982, the defendant Blackburn wrote plaintiff a letter which, in pertinent part, said:

"Since you have had difficulty in working with departments with important responsibilities and have refused to keep records *as prescribed by the 'Records Keeping Manual'* I cannot consider nominating you to the office of Magistrate for another term" (emphasis added).

\*   \*   \*   \*   \*   \*

Plaintiff talked with defendant Blackburn about his unfavorable letter and, getting no satisfaction, brought this suit seeking relief for alleged violations of her rights of free speech and redress of grievances under the First Amendment to the Constitution of the United States. A hearing was conducted on November 22, 1982, which resulted in an order dated December 3, 1982, restraining defendant Blackburn from making nominations which would fill plaintiff's then job with any other person. Further hearings were conducted on December 22, 1982, December 23, 1982, December 30, 1982, and January 10, 1983. Judge Frank W. Snepp, Jr., the senior resident Superior Court judge, was made a party; by agreement of counsel a final hearing on all matters remaining at issue among all parties was conducted on January 10, 1983, and the case is now ready for final decision. The court has filed previous orders and memoranda on December 3, December 23, and two on December 30, 1982. This order duplicates substantial portions of those previous memoranda and orders. This order is based upon the entire record of the case and all the facts found in those previous memoranda and orders; and the omission of any previous finding from this order does not mean that such finding has been abandoned as a basis for this order.

\*   \*   \*   \*   \*   \*

Defendant Blackburn's September 8, 1982 letter based his decision not to renominate plaintiff in substantial part on plaintiff's refusal to keep records *"as prescribed by the Records Keeping Manual."*

On July 13, 1982, the defendant Blackburn had issued a memorandum to all civil trial magistrates directing that in addition to microfilming judgments (which they were already doing), magistrates would "begin microfilming the following documents upon completion of a Small Claims Case:

1. The complaint;
2. All processes issued and returns made thereon;
3. Judgments;
4. All orders and other documents signed by you."

The statute Blackburn relied on for this order, N.C.G.S. 7A–175, reads:

"A magistrate shall *keep* such documents, accounts, and other records, under the general supervision of the clerk of superior court, *as may be prescribed by the Administrative Office of the Courts.*" (Emphasis added.)

The "Record Keeping Manual" of the Administrative Office of the Courts (Plaintiff's Exhibit 48) to which Blackburn referred in his September 8, 1982 letter, does not require the magistrates to perform the microfilming duty. The pertinent section of the AOC regulations, Rule 4E, reads:

E. *Microfilm.* Each small claims case shall be microfilmed by one of the methods described in Rule 2. Regardless of the method chosen, the *clerk* shall microfilm the following documents:

the complaint;

all processes issued and returns made thereon;

judgments;

all Orders and other documents signed by the judge or magistrate. (Emphasis added.)

Rule 4E quite clearly places the burden of microfilming upon the "clerk."

When plaintiff received the directive from the clerk she challenged the propriety of the order. At that time she had an extra heavy case load because one of the magistrates was out of service; she had several hundred cases on her desk; she was, as usual, doing her own typing; and she did not feel that she should stop doing her judicial work and start doing additional microfilming for the clerk.

Plaintiff spoke to her supervisor, Chief Judge Chase Saunders, to see if some relief, such as extra clerical help, could be obtained. At Judge Saunders' suggestion (page 44, Transcript of November 22, 1982 hearing), she talked to Senator Parks Helms and Representative Louise Brennan of the Mecklenburg legislative delegation about possibly getting a microfilming clerk. She talked, at Judge Saunders' suggestion, with defendant Judge Frank Snepp. She also talked with a person from the Administrative Office of the Courts, and with Tom Ray, Chairman of the Board of County Commissioners, She talked with the other magistrates. Chief Judge Saunders told her that he thought the clerk had the authority to require the magistrates to do the microfilming. Eventually, after a week or two of futile explorations, she complied with the directive to perform the extra clerical work.

On the day the plaintiff received her "no renomination" letter of September 8, 1982, she talked with Mr. Blackburn, who mentioned the controversy over microfilming in connection with his action. At that time he told her that he would not have plaintiff going over his head to talk with judges or county commissioners or legislators, and that he could "hire and fire who I please, whatever the reason."

I find as a fact that the reason Blackburn did not recommend plaintiff for renomination was that she protested the additional clerical duties and because she talked about the problems with other persons concerned in the administration of the courts including District Judge Saunders, her supervisor; a Superior Court judge; a county commissioner; members of the legislative delegation; and a person from the Administrative Office of the Courts.

Blackburn had never spoken to the plaintiff about his intention not to renominate her until he wrote the September 1982 let-

ter. The only controversial incident involving plaintiff which had happened during or before mid-1981 was a mix-up about a parking space that had been assigned to her—the sort of thing that happens in government parking lots. A government employee who has an assigned parking space and has not had some problems with it must be rare indeed; plaintiff's account of that incident is more plausible than defendant Blackburn's. Blackburn himself testified the rhubarb over parking played no part in his decision.

Blackburn contended that he had decided not to recommend plaintiff some time *back in "the middle" of 1981,* twelve or fifteen months earlier. The reasons for not recommending plaintiff, he said, were numerous complaints from lawyers, unsuccessful litigants and co-workers regarding plaintiff's attitude and her conduct in court. I do not believe nor find that those were the genuine reasons. A review of plaintiff's exhibits 9 through 28 shows that all or nearly all the complaints documented by defendant involved *events which did not occur until after the mid-1981 time when, Blackburn says, he had already decided not to renominate plaintiff.* The earliest such complaint involves a difference with a litigant about interest on a judgment, which took place on the 3rd of July, 1981 (Plaintiff's Exhibit 16). The fact that all but one of the complaints took place *after* Blackburn says he had made his decision leaves the court with the conclusion—and I find as a fact—that those "complaints" had no bearing on his renomination decision.

\*　　\*　　\*　　\*　　\*　　\*

The magistrate is a judicial officer. The functioning and the integrity of the office are dependent upon the protection of that status. The legislature placed in the Administrative Office of the Courts the authority to designate those records which the magistrate might be required to *keep.* The clerk's authority is limited to the supervision *of such record keeping;* but it does not appear from Chapter 7A–175 of the General Statutes of North Carolina that the Clerk has any authority to require the magistrate to *produce* any records, or to keep any records not prescribed by the Administrative Office of the Courts.

Regardless, however, of the merits of that particular issue (I find the plaintiff has the better of it), the plaintiff and the public have an interest in plaintiff's exercise of free speech, including access to judicial, legislative, administrative and political figures, to seek information and help on matters affecting the administration of justice. If judges, regardless of their rank, are going to be gagged, it is something that ought not to be left to the private discretion of the clerk of the court where they serve.

Between the clerk and the magistrate there is no employer-employee relationship, no such "intimate" relationship, no such relationship of "confidence" as to entitle the clerk to deny renomination to a magistrate because she disagrees with his decisions.

The defendant Blackburn is an able public servant, and for nearly a third of a century has been a personal friend of this court. I doubt that he realized he was trampling on anybody's First Amendment rights of free speech or that he was interfering with the functioning of the judicial system which he has spent most of his life ably serving. However, the clerk, like the magistrate, is a public *servant,* rather than a private employer or a battlefield commander, and the purpose of free speech is to keep public servants—even the best of them—on the straight and narrow. It enables people to express themselves, above all, about the use of power, and to *complain about* the use or *misuse* of public power, without the risk of reprisal or punishment. The conduct of the plaintiff was protected by the First Amendment to the United States Constitution.

\*　　\*　　\*　　\*　　\*　　\*

Mr. Blackburn has complied with the court's December 23, 1982, order that he nominate the plaintiff, Georgia Lewis, for reappointment, and advise Judge Snepp that the recommendation was serious. Today's order will not place any additional obligations upon him beyond those already

imposed by or resulting from previous orders.

Although expectation of continued employment is not necessary to support plaintiff's First Amendment claim, the court finds as a fact that in 1982 plaintiff had a reasonable expectation of reappointment to her post as magistrate. This expectation is based on her three terms of satisfactory service; on her superior qualifications for the job; on her previous three uneventful nominations and appointments; on the seldom-broken custom of reappointing magistrates whose service had been satisfactory; and on the absence of any substantial reason (except her exercise of her constitutional right to speak and seek redress of grievances) why she was denied renomination. It is also supported by the manner in which Blackburn himself spoke of his role *vis a vis* the magistrate; his use of the term "fire" on two occasions of record when he was obviously talking about refusing to renominate indicates a view on his part that magistrates presumably will continue to be reappointed unless good cause to the contrary is shown.

\*     \*     \*     \*     \*     \*

## THE CASE AS TO THE DEFENDANT SNEPP

Judge Frank W. Snepp, Jr., the additional defendant, was made a party to the case by order dated December 30, 1982. He filed answer and, by agreement of counsel, the case was heard on the merits and is being decided finally on the merits as to Judge Snepp as well as to Mr. Blackburn.

On December 28, 1982, the defendant Blackburn made the nomination required by this court in the form of his December 28, 1982, letter to Judge Snepp.

On December 28, 1982, Judge Snepp wrote a letter to defendant Blackburn which included the following statements:

"Although it is my general policy to reappoint magistrates who have rendered satisfactory service, in order to give some assurance of tenure, I am deeply and sincerely opposed to unwarranted intrusion upon the legitimate responsibilities and duties of a state judge by federal courts. I regard the language used in Judge McMillan's order, as well as the dictation as to whom you could recommend as a second nomonee [sic], as such an intrusion.

"I therefore decline as a matter of principle to reappoint Ms. Lewis."

Judge Snepp appointed in place of the plaintiff Gerald L. Frederick, who was the alternate nominated by defendant Blackburn.

Plaintiff then moved for an order making Judge Snepp a party defendant and directing defendant Blackburn not to swear in Mr. Frederick for the job which plaintiff had been holding; this was done by order of December 30, 1982, accompanied by a Memorandum of Decision which is of record. The job remains vacant pending final decision in this case.

No relief has heretofore been ordered against Judge Snepp; he was not a party to the proceedings before the December 30, 1982, order was entered.

The January 10, 1983, testimony of Judge Snepp, some 44 pages in length, makes it clear that he declined to reappoint Ms. Lewis because she had exercised her rights under the First Amendment to the United States Constitution by speaking out, to her supervisor Judge Saunders and to Judge Snepp and others, in opposition to the defendant Blackburn's order regarding microfilm copies of case files.

Excerpts from the testimony of the defendant Snepp are as follows:

(a) The custom since the magistrate system was set up in this district was that the clerk would forward his recommendations to the appointing judge in pairs, two nominees for each job, and that the person in the left hand column with an asterisk by his or her name would be understood as the clerk's recommendation for the job (January 10, 1983, hearing, p. 9).

(b) The defendant Snepp had never requested additional nominees (p. 12).

(c) When defendant Blackburn's written recommendations reached Judge Snepp on December 28, 1982, he "had long ago determined I would not reappoint the plaintiff" (p. 12).

(d) "My authority under the North Carolina Constitution and the North Carolina statutes to appoint or not to appoint is *absolute* . . . " (p. 13) (emphasis added).

(e) Judge Snepp did not interview any of the twenty-one second-line nominees except Mr. Frederick (p. 21).

(f) Reappointment of any incumbent is viewed by Judge Snepp "only as a matter of grace" (p. 21).

(g) In the last two sets of biennial recommendations, he has reappointed incumbents forty-one out of forty-two times (p. 23).

(h) Ms. Lewis has not brought any "public disrepute on the system by her behavior" (p. 24).

(i) " . . . as an ordinary thing I am not going to clean house, I am going to reappoint incumbents unless in my judgment I should not" (p. 24).

(j) The defendant was "offended" by the inquiry the plaintiff made of him in September as to whether she was required to do the extra clerical work (p. 26). She should have discussed it "with the Clerk and not with other persons in the justice system" (p. 26). [Not even her supervisor, Judge Saunders.]

(k) After his first conversation in July 1982 with Ms. Lewis, he formed the opinion that she was a "malcontent" (p. 27).

(*l*) When he received Mr. Blackburn's letter of September 8, 1982, indicating that he was not going to recommend Ms. Lewis for reappointment, Judge Snepp would not have appointed her" at any time thereafter (p. 37).

(m) "I would not have reappointed her because I do feel that she is a malcontent; I feel that she has a somewhat exaggerated idea of the dignity of her position and I feel that her refusal to follow the directive of the Clerk was detrimental to the administration of the Magistrate system" (p. 43).

(n) "I wouldn't say that more clerks aren't needed. Everybody knows that we do not have enough personnel, especially at this time when hiring has been frozen in the Clerk's office, . . . " (p. 44).

(*o*) "COURT: Do you think the First Amendment to the Constitution has any relationship to the case?

"A. No, sir. I think that under *Roth* the only time that that would be pertinent would be if there were evidence of a pattern of discrimination in appointments by the appointing authority, based on race or sex" (p. 45).

In his *letter* of December 28, 1982, Judge Snepp has said that he refused to reappoint the plaintiff "as a matter of principle" because of the fact that she had gone to federal court and got an order which attempts to protect her First Amendment rights. In his *testimony* on January 10, 1983 (p. 37), he said that he had formed the opinion at least as early as September 8, 1982, three and one-half months before the appointment deadline, that he would not appoint Ms. Lewis because she was a "malcontent." On this record, both rationales add up to the same thing: Magistrates in Mecklenburg County, although judicial officers of the district court, should be seen and not heard, and reprisals are in store for any magistrate who complains or seeks change, or who files suit in federal court to vindicate constitutional rights.

Ms. Lewis's original inquiry and complaint about the additional microfilm duties were made strictly through "channels"; the first person to whom she spoke about it was Judge Chase Saunders, the Chief District Judge, *who was her supervisor.*

*It was Judge Saunders, plaintiff's supervisor, who suggested* to plaintiff that she speak to Judge Snepp, and to Senator Parks Helms and Representative Louise Brennan about getting some relief through legislative channels.

Defendant Blackburn, in his September 8, 1982, letter notifying plaintiff that she would not be nominated, *and* in his testimony at the November 22, 1982, hearing (Tr.,

p. 56, lines 6–9), said that the additional microfilming duties imposed on the magistrate were the result of a mid-1982 amendment to the Record Keeping Manual *"requiring* this information" (emphasis added). The amendment to the manual (Plaintiff's Exhibit 48, pages 142, 144) makes no such "requirement," and does not even seem to support such a *contention.* The testimony of defendants that the microfilming duty was justified by vague, after-the-fact conversations with people in the Administrative Office of the Courts is not persuasive. *The case, however, does not turn on who was right in that dispute; if free speech means anything it must include the freedom to be honestly mistaken.*

\* \* \* \* \* \*

Reinstating plaintiff will not inconvenience anyone else. At the January 10, 1983, hearing there was testimony by Judge Snepp that present Chief Judge Lanning had refused to administer the oath at New Year's to one of the twenty magistrate appointees, because of adverse information of which Judge Snepp had been unaware. Judge Snepp, at the hearing, indicated general agreement with Judge Lanning's decision. That leaves not one but two vacancies among the magistrates. There is thus no impediment of even a technical or an emotional nature to the immediate reappointment of Ms. Lewis.

\* \* \* \* \* \*

## CONCLUSIONS OF LAW

■ 1. A state judge, as a judicial officer and as a public official, is bound by the United States Constitution.

Article VI of the Constitution of the United States (the "supremacy clause") provides in pertinent part:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; *and the Judges in every State shall be bound thereby,* any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. (Emphasis added.)

42 U.S.C. § 1983 provides:

Civil action for deprivation of rights

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. The First Amendment is also part of that "supreme Law of the Land" by which all public officials, including judges, are bound.

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

3. The First Amendment is probably the most important part of the Bill of Rights. It allows citizens, whether government employees or others, to criticize the government and to complain if bureaucrats, including judges, fail to do their jobs correctly or do anything oppressive or unlawful. Unless the individual who sees or feels the hand of power used unlawfully is free to complain about it and to criticize it, our system of checks and balances can not work. The right to criticize government and government agencies and the right to petition other government agencies or agents for redress of grievances is indispensable if the system is to work, if the powers of government are to be kept separate, and if we are to "keep the government off the backs of people."

■ 4. The First Amendment protects both Judge Snepp in his criticism of federal judges and the plaintiff in her criticism of the defendant Blackburn and in her approach to other authorities to try to get a

redress or adjustment of her grievance. It is not necessary for the success of Ms. Lewis's First Amendment claim that she be correct (as I think she was) in her view that defendant Blackburn was requiring her to do things that a magistrate should not have to do. Free speech embraces speech that is erroneous as well as speech that is correct, at least in the absence of facts not present in this record.

5. This court has found as fact, and concludes as a matter of law, that Ms. Lewis had a legitimate expectation of renomination and reappointment. It makes no difference, however, whether or not plaintiff had such a legitimate expectation. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) squarely holds that the existence of a "property interest" is not necessary to support a claim of violation of the First Amendment. 408 U.S. at 596, 599, 92 S.Ct. at 2697, 2698. Defendants' reliance on *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) is misplaced. *Roth* required showing of such an interest in order to measure the scope of "what process was due"; though First Amendment claims had been alleged, there were no First Amendment questions before the Supreme Court when its decision was made. 408 U.S. at 574, 92 S.Ct. at 2707; *see Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) and *Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (*non*-tenured teacher can establish claim for reinstatement where a board's decision not to rehire is based on a teacher's exercise of a protected First Amendment Right).

> "For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

> For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser v. Randall,* 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460]. Such interference with constitutional rights is impermissible."

*Perry v. Sindermann,* 408 U.S. at 597, 92 S.Ct. at 2697.

6. Although defendant has the discretion to decide whom to appoint as magistrate from among the names submitted by the clerk of court, that discretion can not be exercised to violate the First Amendment rights of the plaintiff. Normally, a court will not interfere with the judgments or acts that are committed to another officer's discretion. But the court will fashion an appropriate remedy, including affirmative relief, where an officer exceeds the scope of his discretion by violating the law or acting in excess of his authority. In *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the Supreme Court says:

> "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain, the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.

> "In the 3d vol. of his Commentaries (p. 23), Blackstone states two cases in which a remedy is afforded by mere operation of law. 'In all other cases,' he says, 'it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is invaded.' And afterwards (p. 109, of the same vol.), he says, 'I am next to consider such injuries as are cognizable by the courts of the common law. And herein I shall, for the present, only remark, that all possible

injuries whatsoever, that did not fall within the exclusive cognizance of either the ecclesiastical, military or maritime tribunals, are, for that very reason, within the cognizance of the common-law courts of justice; for it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress.'

"The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."

5 U.S. (1 Cranch) at 162–63, 2 L.Ed. 60.

The Court held in *Marbury* that mandamus (an affirmative order from a lower court) was the appropriate remedy to require Secretary of State Madison to deliver a commission to William Marbury, who had been appointed as justice of the peace by former President John Adams.

7. Examples of relief provided by courts where public officers in exercising their "discretion" have violated the First Amendment rights of individuals include: *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (the Supreme Court held that a teacher's exercise of his right to speak on issues of public importance could not furnish the basis of dismissal from public employment; accordingly, the Court reversed the decision of the Illinois Supreme Court upholding the dismissal and remanded the case for proceedings consistent with that holding); *Visser v. Magnarelli*, 530 F.Supp. 1165 (N.D.N.Y. 1982) (District Court held that the Common Council could not refuse to reelect plaintiff to his position as city clerk because of his political affiliation; the court ordered the plaintiff retained as city clerk until the Common Council held an election in accord with the principles of the First Amendment); *BenShalom v. Secretary of the Army*, 489 F.Supp. 964 (E.D.Wis.1980) (the District Court ordered reinstatement, with full privileges earned prior to discharge, of a woman who was honorably discharged from the military because of her sexual preferences; the Court noted the need to give the military the "widest possible latitude" in personnel decisions but found that reinstatement was the relief to which plaintiff was entitled); *Murray v. Vaughn*, 300 F.Supp. 688 (D.R.I.1969); *Murray v. Blatchford*, 307 F.Supp. 1038 (D.R.I.1969) (the District Court declared that plaintiff's First Amendment rights were violated by expulsion from the Peace Corps for publishing a letter critical of United States foreign policy; among other things, the Court ordered expungement of plaintiff's employment record, recomputation of a reassignment allowance, reclassification of the plaintiff as a II–A in the Selective Service, and cancellation of the induction notice). Other relief awarded where officials have overstepped the bounds of their discretion include: *Johnson v. Reed*, 609 F.2d 784 (5th Cir.1980) (the Appeals Court upheld the District Court's decision that consideration of plaintiff for promotion based on incorrect and incomplete records was arbitrary and capricious; the Fifth Circuit also upheld the relief ordered of reinstatement, correction of the promotion records, $10,000 in damages, and requiring that the selection board meet within a specified time to reconsider the plaintiff for promotion); *Sanders v. United States*, 594 F.2d 804 (Ct.Cl.1979) (the court held that failure to void passovers for promotion which arose from defective reports was arbitrary and capricious; the court granted plaintiff's motion for summary judgment and ordered back pay, reinstatement, removal of records of passovers, and placement of a nonprejudicial explanation in the personnel record).

Defendants cite no authority that supports the proposition that discretionary acts are not reviewable when performed in a fashion that violates the Constitution. The cases cited involved either no allegations of violations of constitutional or statutory rights, or insufficient proof of such violations. *Kiem v. United States*, 177 U.S. 290, 20 S.Ct. 574, 44 L.Ed. 774 (1900); *Evans v. Watertown*, 417 F.Supp. 908 (D.Mass.1976); and *Field v. Boyle*, 503 F.2d 774 (7th Cir. 1974). The case of *Jones v. Hopper*, 410

F.2d 1323 (10th Cir.1969), *cert. denied,* 397 U.S. 991, 90 S.Ct. 1111, 25 L.Ed.2d 399 (1970) is of course no longer good law since *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), *supra.*

■ 8. The fact that the defendant Snepp is a judge does not exempt him from the legal duty to exercise his discretion *within the bounds of the Constitution.* In appointing magistrates, the defendant is fulfilling a *ministerial,* as opposed to a judicial duty. There is no judicial immunity in the performance of ministerial duties. *McCray v. State of Maryland,* 456 F.2d 1, 4 n. 7 (4th Cir.1972); *Lynch v. Johnson,* 420 F.2d 818, 820 (6th Cir.1970); *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 736, 100 S.Ct. 1967, 1977, 64 L.Ed.2d 641 (1980) (members of Supreme Court of Virginia held liable individually in their "enforcement" capacities). The factors which determine whether an act of a judge is judicial or ministerial relate to the nature of the act itself, not to the identity or title of the actor. *Stump v. Sparkman,* 435 U.S. 349, 362, 98 S.Ct. 1099, 1107, 55 L.Ed.2d 331 (1978); *Ex Parte Virginia,* 100 U.S. 339, 348, 25 L.Ed. 676 (1879) (Supreme Court upheld Act of Congress as constitutional which provided penalties for state court judges who selected juries so as to exclude blacks; selection of jurors by judges is a ministerial act because the duty could be performed by private persons or other officials).

Appointment of magistrates and other judges is ministerial; it is not required to be done by judges; it is a power to *select* that in North Carolina is vested variously in governors, district bar organizations, judges, local governing boards, local officials, and the electorate. The act of appointing to office is not a *judicial* duty. Judicial duties are primarily acts necessary in the hearing and decision of cases or controversies.

■ 9. Even if the act of appointment were considered a "judicial duty, judicial immunity protects a judge only from money damages, and not from injunctive or declaratory relief. *Timmerman v. Brown,* 528

F.2d 811, 814 (4th Cir.1975); *Fowler v. Alexander,* 478 F.2d 694, 696 (4th Cir.1973). Other circuits follow this approach; for example, *Heimbach v. Village of Lyons,* 597 F.2d 344, 347 (2d Cir.1979); *Harris v. Harvey,* 605 F.2d 330, 335 n. 7 (7th Cir.1979), *cert. denied,* 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980); *Shipp v. Todd,* 568 F.2d 133, 134 (9th Cir.1978). In *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), the Supreme Court said that *"we have never held that judicial immunity absolutely insulates judges from declaratory or injunctive relief with respect to their judicial acts."* 446 U.S. at 735, 100 S.Ct. at 1976 (emphasis added). (The Court declined to decide the issue in that case because the judges could be held liable in their enforcement, as opposed to judicial, capacities).

10. Defendants have cited no authority for the proposition that judicial immunity bars the requested relief. At the hearing on January 10, 1983, defense counsel made oral reference to C.J.S., "Judges" § 86 and cases cited therein, with no helpful direction to this court. The cases cited by defendant Blackburn in his motion to dismiss, in fact *support* the proposition that judicial discretion is subject to mandamus where it is abused or used contrary to law. In *Ponder v. Joslin,* 262 N.C. 496, 504, 138 S.E.2d 143, 149 (1964), the North Carolina Supreme Court said: "It is well settled law that mandamus cannot be invoked to control the exercise of discretion of a board, officer or court when the act complained of is judicial or quasi judicial, unless *it clearly appears that there has been an abuse of discretion*" (emphasis added). In *General Electric Company v. Turner,* 275 N.C. 493, 497, 168 S.E.2d 385, 388 (1969), the court held that the state officer's discretion could not be interfered with *because* there was no evidence that the "state officers acted either *corruptly, or in violation of the law, or in excess of authority*" (emphasis added).

11. Defendant Blackburn's refusal to renominate plaintiff was a violation of her First Amendment rights. However, he has now done all the court has required of him

to correct the situation; he has not been the cause of actual money damages to plaintiff; it would appear, on the present record at least, that no further relief is sought of him except costs and attorney's fees, which plaintiff is entitled to recover.

■ 12. Defendant Snepp's refusal to reappoint plaintiff was a violation of her First Amendment rights. He should be required to correct that violation, and to pay costs and attorney's fees.

\* \* \* \* \* \*

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:

1. That defendant Frank W. Snepp, Jr. is ORDERED AND DIRECTED to reappoint plaintiff, at once, for a current two-year term in her former position as magistrate for Mecklenburg County, North Carolina.

2. That both defendants are liable to pay costs and attorney's fees, which will be assessed and apportioned later.

SUPPLEMENTAL FINDINGS OF FACT

Plaintiff has made a motion that the court make additional findings of fact as to the defendant Snepp.

This court's order was entered on the afternoon of Thursday, January 13, 1983.

The next morning, Friday, January 14, 1983, defendants filed notice of appeal to the Fourth Circuit Court of Appeals.

On January 21, 1983, plaintiff filed this motion requesting additional findings of fact.

■ Normally, the filing of a notice of appeal ousts the jurisdiction of the trial court.

However, "a quick filing of notice of appeal by one party" does not "defeat the adverse party's right to have the district court consider the merits of a timely filed motion under Rule 52(b)." *Elgen Manufacturing Corporation v. Ventfabrics, Inc.,* 314 F.2d 440, 444 (7th Cir.1963). North Carolina practice appears to be in accord. *Parrish v. Cole,* 248 S.E.2d 878, 38 N.C.App. 691 (1978). The purpose of a Rule 52(b) motion

is "to enable the appellate court to obtain a correct understanding of the factual issues determined by the trial court." Charles Alan Wright, *Law of Federal Courts,* § 96, at 478 (3rd Ed.1976). The "ten-day grace period [provided by Rule 52(b) ] is unlikely to disrupt the appellate process," and the additional findings "will provide the appellate court with a better understanding of the trial court's decision, thus promoting the judicial process." *Parrish v. Cole, supra,* 248 S.E.2d at 880.

What the plaintiff requests in her motion is that the court rephrase certain findings of fact so that what is obviously implicit from those findings is made more clearly explicit.

I do not see that the rephrasing is necessary, because the conclusion plaintiff seeks is what the court has already found, and it is obvious from the order as entered. Specifically, for example, page 11, next to last paragraph, reads as follows:

The January 10, 1983, testimony of Judge Snepp, some 44 pages in length, makes it clear that he declined to reappoint Ms. Lewis because she had exercised her rights under the First Amendment to the United States Constitution by speaking out, to her supervisor Judge Saunders and to Judge Snepp and others, in opposition to the defendant Blackburn's order regarding microfilm copies of case files.

However, it is better to be redundant than to leave a doubt.

I therefore expressly find as facts that the defendant Judge Snepp declined to reappoint plaintiff Lewis because she had exercised her right under the First Amendment to the United States Constitution by speaking out to her supervisor, Judge Saunders, and to Judge Snepp and others in opposition to defendant Blackburn's order regarding microfilming copies of case files (see January 13, 1983 order, page 11); that defendant Snepp's opinion that plaintiff was a "malcontent" with a "somewhat inflated idea of the dignity of her office" was based on plaintiff's complaints regarding

the microfilming; and that but for those complaints she would have been routinely reappointed.

The court further finds as a fact that if the plaintiff had not made her complaints about microfilming, including the complaint filed in federal court, the defendant Snepp would have reappointed plaintiff to her position as magistrate.