734 F.2d 1000
 Georgia J. LEWIS, Appellee,
v.
R. Max BLACKBURN, Appellant,
and
Frank W. Snepp, Defendant.
North Carolina Civil Liberties Union, Amicus Curiae/E.
Georgia J. LEWIS, Appellee,
v.
R. Max BLACKBURN, Defendant,
and
Frank W. Snepp, Appellant.
North Carolina Civil Liberties Union, Amicus Curiae/E.
 Nos. 83-1040(L), 83-1041.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 7, 1983.
Decided May 17, 1984.
 
 Harry H. Harkins, Jr., Asst. Atty. Gen., Millard R. Rich, Jr., Deputy Atty. Gen., Raleigh, N.C. (Rufus L. Edmisten, Atty. Gen., Jane S. Barkley, Raleigh, N.C., on brief), for appellants.
 George Daly, Charlotte, N.C., for appellee.
 Norman B. Smith, Greensboro, N.C., Daniel H. Pollitt, Univ. of North Carolina, School of Law, and Dean Shangler and Jay Trehy, Third Year Law Students on brief as amicus curiae.
 Before WINTER, Chief Judge, ERVIN, Circuit Judge, and ALDRICH,* Senior Circuit Judge.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 Since August, 1978, Georgia Lewis has served as a magistrate in the state courts of Mecklenburg County, North Carolina. Under Article IV, Sec. 10 of the North Carolina Constitution, magistrates are appointed every two years by the senior resident superior court judge of the county from a list of nominations submitted by the clerk of superior court; once appointed, magistrates serve as officers of the county district court and report to the chief district judge. N.C.Gen.Stat. Secs. 7A-170-171.
 
 
 2
 In the summer of 1982, following a dispute over job assignments with Max Blackburn, the clerk of superior court, Lewis learned she would not be renominated by Blackburn for the new term of office commencing January 1, 1983. She promptly filed suit under 42 U.S.C. Sec. 1983, contending primarily that Blackburn's refusal to renominate her resulted from the exercise of her First Amendment right of free speech.[1] Later, the senior resident superior court judge, Frank Snepp, was added as a defendant after he refused to reappoint Lewis as a magistrate. The district court ultimately found in Lewis's favor, 555 F.Supp. 713 (W.D.N.C.), and ordered Lewis's immediate reappointment. That order was stayed by us pending appeal. We now vacate that order and affirm.
 
 I.
 
 3
 The facts of this case are set out in exacting detail in the opinion of the district court. We need only to summarize them:
 
 
 4
 Georgia Lewis was appointed a Mecklenburg County magistrate in 1978 to fill a vacant position. She was reappointed for a regular biennial term from January 1, 1979, to December 31, 1980. Her appointment was again renewed in 1980 for the period from January 1, 1981, to December 31, 1982. In the summer of 1982, she had major responsibility for the small claims docket of the district court.
 
 
 5
 On July 13, 1982, Max Blackburn, the clerk of superior court, sent a memorandum to all civil trial magistrates ordering them to begin microfilming small claims documents in addition to other microfilming duties already handled by magistrates. Blackburn claimed authority to issue this directive under the "Record Keeping Manual" of the State Administrative Office of the Courts and pursuant to his supposed supervisory authority over record keeping by magistrates. See N.C.Gen.Stat. Sec. 7A-175. However, the lawfulness of Blackburn's directive is hotly contested by the parties. Lewis strongly protested this additional work burden, and she carried her objection to the chief district court judge. He advised her to speak to the senior resident superior court judge for Mecklenburg County, defendant Judge Frank Snepp, to the state Administrative Office and also to state legislators who could procure more money for the court system. Accordingly, she took the matter to Judge Snepp and to North Carolina State Representatives Parks Helms and Louise Brennan and local officials to complain of Blackburn's assignment, to question Blackburn's authority over her, and to request that additional magistrates be allocated to Mecklenburg County by the General Assembly. All those to whom Lewis spoke felt that Blackburn had statutory authority to require the additional work, and starting in August, 1982, Lewis complied with the directive (although she still protests its validity).
 
 
 6
 On September 8, 1982, Blackburn wrote Lewis informing her that "since you have had difficulty in working with departments with important responsibilities and have refused to keep records as prescribed by the 'Record Keeping Manual,' I cannot consider nominating you to the office of magistrate for another term."
 
 
 7
 Lewis immediately filed suit in federal court, principally alleging that Blackburn's decision not to reappoint her violated her First Amendment rights to freedom of speech and to petition the government for a redress of grievances. Lewis charged that but for her speech critical of Blackburn regarding the microfilming assignment, Blackburn "would have placed her name first on the list of nominees, thereby under prevailing custom guaranteeing her reappointment."
 
 
 8
 A hearing was held on November 22, 1982, after which the district court ruled that Blackburn had violated Lewis's First Amendment rights. The district court specifically found that certain prior complaints from lawyers and the general public about Lewis were not the "genuine reasons" behind Blackburn's decision not to renominate her, contrary to Blackburn's assertions. The district court ordered Blackburn to nominate Lewis for reappointment and to indicate to Superior Court Judge Frank Snepp, who was to make the final selection of magistrates, that the nomination was "for real." Blackburn promptly complied, submitting to Snepp, as required by law, Lewis's name and that of one other nominee for the same position, Gerald Frederick.
 
 
 9
 On December 28, 1982, Judge Snepp declined to appoint Lewis, naming Frederick instead. In a letter to Blackburn, Judge Snepp wrote:
 
 
 10
 Since you were ordered by Judge McMillan to use this specific language, I can only conclude that this is an attempt by him to influence, if not coerce me, to appoint Ms. Lewis regardless of my judgment as to whether it would be in the best interest of the magistrate system to do so. Although it is my general policy to reappoint magistrates who have rendered satisfactory service, in order to give some assurance of tenure, I am deeply and sincerely opposed to unwarranted intrusion upon the legitimate responsibilities and duties of a state judge by federal courts. I regard the language used in Judge McMillan's order ... as such an intrusion ... I therefore decline as a matter of principle to reappoint Ms. Lewis.
 
 
 11
 He further indicated that plaintiff was not appointed because "the plaintiff was a malcontent, whose appointment to another term would not be in the best interest of the court system." Shortly thereafter, Judge Snepp was joined as a defendant in this case. After a hearing on January 10, 1983, at which Judge Snepp testified at length, the district court found that but for the microfilming incident, Judge Snepp would have reappointed Lewis. The district court thereupon held that Judge Snepp had violated Lewis's First Amendment rights and ordered him to appoint Lewis to a magistrate's position at once. From that order the defendants appeal.
 
 II.
 
 12
 Before addressing the merits of this case, we first consider defendants' contention that under the principles stated in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and subsequent decisions, the district court should have abstained from interfering in certain state judicial proceedings. We note at the outset that defendants made no claim of abstention in the district court. We would be justified in refusing to consider the defense because a party should not be permitted to withhold a claim at trial and invoke it only on appeal when the result of the trial is adverse to him. But in any event, we think that the contention is lacking in merit.
 
 
 13
 The Younger principles, in our view, apply only when there are ongoing state criminal proceedings or state civil proceedings involving important state issues. In this case, the only "proceedings" is the decision by Judge Snepp whether or not to reappoint Lewis. The district court found this to be a ministerial, not a judicial, act. Moreover, the appointment decision was a unilateral, ex parte act, not an adversary proceeding which provided a forum for the airing and adjudication of Lewis's First Amendment claim. While North Carolina does provide state judicial process whereby Lewis can challenge Judge Snepp's alleged violation of her First Amendment rights, that fact is irrelevant. Under Younger, the deference which is due is to Judge Snepp's decision, not to any future proceedings which Lewis could institute. The availability of a state remedy goes to the question of whether exhaustion of state remedies is a prerequisite to a suit under 42 U.S.C. Sec. 1983, and it has been held that exhaustion is not required. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).
 
 
 14
 In summary, because there is no currently pending proceeding that is capable of adjudicating Lewis's First Amendment claim, we hold that the principles of Younger do not apply. See Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).[2]III.
 
 
 15
 To begin our consideration of the merits, we discern no clear error in the district court's findings of fact pertaining to the defendants' motives. See Fed.R.Civ.P. 52(a). In particular, we offer no quarrel with the finding of fact that Blackburn declined to renominate Lewis because she spoke out against the microfilming assignment. 555 F.Supp. at 716. Similarly, we accept the district court's finding that Snepp refused to reappoint Lewis because of her vocal opposition to Blackburn's directive. Id. at 718.
 
 
 16
 Even if we assume that Lewis had no property interest in her position,[3] it is true that Blackburn or Judge Snepp could have refused to renominate and reappoint her for a foolish reason or for no reason at all. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It is equally clear, however, that they could not lawfully have refused to renominate and reappoint her for an unconstitutional reason, such as in retaliation for the exercise of rights protected under the First Amendment, as applied to the states through the Fourteenth Amendment. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The issues that must be addressed in this case, therefore, are whether the district court was correct in deciding that Lewis's actions were protected under the First Amendment and, if so, whether the district court was correct in concluding that, but for those actions, she would have been renominated and reappointed to her position by Blackburn and Judge Snepp. Mount Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).
 
 A.
 
 17
 Resolution of the question of whether a public employee's speech is protected under the First and Fourteenth Amendments so that adverse employment action may not be based upon that speech is governed primarily by the Supreme Court's decisions in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Those cases made clear that public employees cannot, as a condition of their employment, be required to relinquish their First Amendment rights to comment on matters of legitimate public concern even in connection with the operation of the state government for which they work. Pickering, 391 U.S. at 568, 88 S.Ct. at 1734; Connick, 461 U.S. at ----, 103 S.Ct. at 1687.[4] Thus, as a threshold matter, the speech must have been upon a matter of public concern. Connick, 461 U.S. at ---- - ----, 103 S.Ct. at 1687-89. If it was, the propriety of the dismissal depends upon a balancing test. In accommodating both the employee's First Amendment rights and the state employer's legitimate interest in the efficient operation of government, the Court in Pickering articulated four basic factors to be considered: first, was the criticism or comment directed at any person with whom the employee will be in daily contact, thus affecting discipline by immediate superiors or harmony among coworkers; second, is the relationship between the employee and the person criticized a close working relationship for which it can persuasively be claimed that loyalty and confidence are necessary to their proper functioning; third, did the criticism or comment damage the personal reputation of the person criticized; and fourth, were the issues spoken about matters of public interest in the administration of state or local government? See also Connick, --- U.S. at ---- - ----, 103 S.Ct. at 1691-93.
 
 
 18
 As we have indicated, the threshold question is whether Lewis's speech was upon a matter of legitimate public concern, or was instead relevant solely to her as an employee. To our minds, the fact that a judicial system is so understaffed and underfunded that judges are required to spend their time microfilming case documents other than judgments rather than performing judicial duties is of substantial concern to the public. Not only may this mean that too little time is being spent deciding cases, it may also mean that high-paid magistrates are performing clerical duties, thus wasting taxpayer dollars.
 
 
 19
 Moreover, the public nature of this issue is demonstrated by reply of the chief district court judge (Chief Judge Saunders) to Lewis's questions to him. Rather than tell her to suppress her complaint or to speak to Blackburn, he recommended that she speak to state legislators who could procure more money for the court system, or to Judge Snepp, who was more able to influence state legislators to the same end. Judge Snepp also indicated at trial that Lewis's desire to have clerical help with the microfilming was properly addressed to the legislature. We think that matters suitable for legislative attention are matters of public concern.
 
 
 20
 We therefore conclude that Lewis's speech was protected speech under the First and Fourteenth Amendments, and we turn to the question of whether the content or context of that protected speech justified Blackburn's or Judge Snepp's decision not to reappoint her. As noted above, this analysis implicates the factors set forth in Pickering.
 
 
 21
 Tested by the Pickering factors, Mrs. Lewis's speech fell within the range of protected expression. First, magistrates in North Carolina are independent constitutional officers, not members of a clearly hierarchical chain of employment relationships. They hear and adjudicate cases by themselves, rather than working in group or collegial settings. To the extent that Lewis had an immediate supervisor, it was Chief District Judge Saunders, and it was he who suggested that she take her questions about the microfilming order to Judge Snepp, the Administrative Office, and the state legislature.
 
 
 22
 To the extent that Lewis is required to work with Blackburn on record-keeping matters, it cannot persuasively be claimed that confidence and loyalty are necessary to the proper functioning of this relationship, and the district court so found. Absolutely no facts were presented at trial to indicate why Blackburn and Lewis would be unable to cooperate sufficiently in the future to ensure performance of these administrative tasks. In addition, Lewis's complaint was made in the context of a reasonable belief that Blackburn did not have the authority to issue her this order; there is no indication that she was unwilling to follow any order he issued that was not apparently in direct conflict with the clear language of the Administrative Office Record Keeping Manual or with any order issued by Judge Snepp or Chief Judge Saunders.
 
 
 23
 Moreover, it is apparent that Lewis's comments in no way damaged the personal reputation of Blackburn or any other member of the state judicial system.
 
 
 24
 Finally, Lewis's comments dealt with the inadequacy of the clerical help available to state magistrates and to the fact that magistrates' time, which would be better spent deciding cases, was being spent performing clerical duties. The public airing of such matters undoubtedly involves the public interest, and the private communication of this matter to Judge Snepp, who has the visibility and influence to request additional clerical help, is similarly justified. In sum, we think that Lewis's speech dealt with an area of obvious public interest, was directed (at Chief Judge Saunders' suggestion) to appropriate state officials, and was not of a nature or in a setting that threatened satisfactory future operation of this portion of the state judiciary.
 
 
 25
 We therefore conclude that Mrs. Lewis's speech was protected expression under Pickering and could not lawfully form the basis for adverse employment action by the state or its officers. We do not doubt that Lewis's motivation in giving voice to her complaints may have stemmed in part from personal pique at being assigned additional duties. But the fact that she was moved by a sense of personal effrontery does not exclude the fact that she spoke to a matter of public interest. The district court found, and its finding is not clearly erroneous, that Lewis "did not feel that she should stop doing her judicial work and start doing microfilming for the Clerk."
 
 
 26
 We also conclude--although we do not think that this played a role in Blackburn's or Judge Snepp's refusal to renominate and reappoint Lewis--that Lewis's refusal to obey the microfilming directive was conduct protected by the right to free speech. It is conceded that for several weeks Lewis refused to obey the Clerk's directive. But the clear language, at the very least,[5] of the state statute and regulations indicated that the Clerk had no authority to issue such a directive. The statute provided that magistrates are to perform clerical duties under the Clerk's supervision, as prescribed by the Administrative Office. The Administrative Office's Record Keeping Manual explicitly stated that the Clerk was to perform all microfilming and did not mention any power of the Clerk to delegate this duty to the magistrates. It seems apparent, thus, that Lewis had a reasonable belief that she was not disobeying a proper order from a person who had the authority to issue such an order. Moreover, when she sought out her immediate supervisor, Chief Judge Saunders, he, rather than ordering her to comply, invited her to bring the matter to the attention of Judge Snepp, the Administrative Office, and state legislators with the authority to provide additional funds for clerical help. When Chief Judge Saunders subsequently informed Lewis that he had concluded that Blackburn did have the authority to issue the microfilming directive, she complied immediately. Under these circumstances--to which should be added the district court's factual finding that Lewis's two-week noncompliance caused no disruption--we cannot conclude that Lewis's refusal to obey the order constituted conduct outside the protection of the First and Fourteenth Amendments.
 
 B.
 
 27
 We turn next to whether, given that the speech was protected and was not a proper basis for dismissal, Blackburn's and Judge Snepp's decisions not to reappoint Lewis were made in retaliation for that speech. The district court found, as a matter of fact, that Blackburn would have renominated Lewis but for her exercise of free speech in protesting to Judge Snepp, the Administrative Office, and the state legislators his order assigning additional clerical duties to magistrates. We think that this finding is fully supported by the evidence of record.
 
 
 28
 At trial, Lewis testified that immediately upon receiving the letter from Blackburn informing her that he would not renominate her, she went and asked him for his reasons. She testified that he told her that he would not have her going over his head to judges or legislators, and that he could fire whomever he pleased, whatever the reason. Blackburn denied making these statements, but Judge Snepp subsequently testified that Blackburn had informed him that he, Blackburn, was angry because Lewis had gone over his head in complaining about the directive. Therefore, not only was the district court in the best position to decide whether to credit Lewis's or Blackburn's version of their conversation, but Judge Snepp's own testimony supported Lewis's version. In addition, Blackburn asserted that he had actually decided many months earlier not to renominate Lewis, based on complaints he claimed to have received from lawyers and members of the public regarding her performance in office. But Blackburn was unable to furnish any documentation or other evidence of such complaints in the period prior to when he claimed to have made this decision. Blackburn also conceded that he had never looked into the substance of any of these complaints. We do not think that it can be said that the district court was clearly erroneous in disbelieving Blackburn's claim that he had decided not to renominate a magistrate he had already renominated twice on the basis of unsubstantiated complaints that he was unable to produce. In our opinion, this pretextual justification simply lends further support to the district court's conclusion that Blackburn would have renominated Lewis but for her decision to question his authority by going over his head to Judge Saunders, Judge Snepp, and the state legislators regarding the microfilming directive. We think, therefore, that the district court was correct in finding that Mr. Blackburn's action was based on Lewis's protected speech, rather than on her performance in office or her conduct in temporarily refusing to obey his order, and that such action was therefore in violation of Lewis's rights under the First and Fourteenth Amendments.
 
 
 29
 The district court also found, as a matter of fact, that Judge Snepp's refusal to reappoint Lewis, once Blackburn had renominated her, was based upon Lewis's protected speech in questioning to him the microfilming directive and upon Judge Snepp's indignation that the district court had issued a mandatory injunction addressed to Blackburn on Mrs. Lewis's behalf. We think that this finding, too, is amply supported by the evidence of record. First, although Judge Snepp testified that he considered Lewis to be a "malcontent," the evidence showed that this opinion was based upon his having taken offense at her decision (at Chief Judge Saunders' suggestion) to speak to him regarding the microfilming directive. Moreover, the letter written by Judge Snepp to Blackburn explaining Judge Snepp's refusal to reappoint Lewis makes clear that Judge Snepp's decision not to reappoint Lewis was in retaliation for the federal court order she obtained in the process of protecting rights secured to her by the United States Constitution. As her activities in seeking such redress were unquestionably protected by the First and Fourteenth Amendments,[6] we conclude that the district court was correct in ruling that Judge Snepp's action was in violation of Lewis's constitutional rights.
 
 
 30
 Indeed, Judge Snepp's forthrightness in revealing the basis for his action was explained by his repeatedly erroneous assertions at trial regarding his understanding of his legal prerogatives regarding the decision not to reappoint Lewis. Judge Snepp testified that, in his view, he had unbridled discretion in making that decision and that, also in his opinion, the First Amendment could not possibly be relevant absent proof that he engaged in a pattern of discrimination, in that Lewis had no property interest in her position. But Perry v. Sindermann, supra, makes clear that Judge Snepp was in error; he could not lawfully refuse to reappoint her in retaliation for her speech or her attempts to seek redress in the federal courts, regardless of whether she had a property interest in her position under state law.
 
 
 31
 Judge Snepp also took the position at trial that he had long ago decided not to reappoint Lewis regardless of Blackburn's recommendation, because in his opinion her talking around the courthouse about the Clerk's authority was bad for morale (in effect thus claiming that it was not protected speech). But Judge Snepp, in response to repeated questions from plaintiff's counsel, was unable to identify the facts on which he based this opinion, and he concluded that he has essentially no contact with the magistrates. In addition, Judge Snepp admitted that he had a policy to reappoint magistrates absent quite unusual circumstances; he admitted that he had reappointed forty-one of the last forty-two incumbents, refusing reappointment only to a magistrate who, when arrested for drunken driving, had forcibly resisted arrest. Based on all of this evidence, we think that the district court was not clearly erroneous in finding that Judge Snepp's decision not to reappoint Lewis had been made in retaliation for her exercise of her First and Fourteenth Amendment rights to free speech and to redress in the federal courts.
 
 
 32
 Because Lewis therefore would have been renominated by Blackburn and reappointed by Judge Snepp but for the exercise of those protected rights, we conclude that she has established a meritorious claim under 42 U.S.C. Sec. 1983.
 
 IV.
 
 33
 The district court concluded that, in order to provide adequate relief for the violation of Lewis's constitutional rights, a mandatory injunction should issue requiring Judge Snepp to reappoint Lewis to the two-year term in her magistrate position. Judge Snepp argues that, as a state judicial officer, he was immune from such relief. The well-established general rule in this circuit, however, is that judicial immunity will not bar injunctive relief. See Timmerman v. Brown, 528 F.2d 811 (4 Cir.1975); see also Supreme Court of Virginia v. Consumers Union, 446 U.S. 719, 735 n. 14, 100 S.Ct. 1967, 1976, n. 14, 64 L.Ed.2d 641 (1980) (strongly implying concurrence in this view). In the present case, monetary damages are barred by Judge Snepp's judicial immunity; Lewis therefore has no adequate remedy at law, and injunctive relief should be available to remedy unconstitutional state action. It should be noted that the mandatory injunction here does not implicate the question of whether a federal court can order a state judge to exercise his discretion in one of the several equally possible ways; here Judge Snepp has conceded that he would have exercised his discretion to appoint Lewis but for her exercise of protected rights. We thus affirm the district court's mandatory injunction.
 
 V.
 
 34
 Finally, Judge Snepp and Blackburn appeal from the district court's order awarding attorney's fees to Lewis, contending that the award constituted an abuse of discretion because they enjoy immunity. We see no abuse of discretion.
 
 
 35
 Attorney's fees are available in Sec. 1983 actions to plaintiffs who prevail against defendants with judicial immunity if those fees are incident to prospective injunctive relief. See Allen v. Burke, 690 F.2d 376 (4 Cir.1982), petition for cert. granted, --- U.S. ----, 103 S.Ct. 1873, 76 L.Ed.2d 806 (1983). As the Supreme Court noted in Consumers Union, supra, 446 U.S. at 738-39, 100 S.Ct. at 1977-78, "[t]he House Committee Report on the [Civil Rights Attorney's Fees Awards] Act indicates that Congress intended to permit attorney's fees awards in cases in which prospective relief was properly awarded against defendants who would be immune from damages awards." We therefore sustain the award.
 
 
 36
 The order staying the judgment of the district court is vacated and that judgment is
 
 
 37
 AFFIRMED.
 
 ERVIN, Circuit Judge, dissenting:
 
 38
 I respectfully dissent.
 
 
 39
 Like the majority, I discern no clear error in the district court's findings of fact pertaining to the defendants' motives. See Fed.R.Civ.P. 52(a). In particular, I offer no quarrel with the conclusion that Blackburn declined to renominate Lewis because she spoke out against the microfilming assignment. 555 F.Supp. at 716. Similarly, I accept the court's finding that Snepp refused to reappoint Lewis because of her vocal opposition to Blackburn's directive. Id. at 718.
 
 
 40
 The crux of the matter, then, is whether Lewis's complaints regarding the microfilming assignment could lawfully provide the basis for her non-reappointment.[1] A recent pronouncement by the Supreme Court convinces me that they could. After judgment in this case was rendered below, the Supreme Court handed down Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1648, 75 L.Ed.2d 708 (1983). Sheila Myers was employed as an assistant District Attorney in New Orleans for over five years, serving at the pleasure of the District Attorney, Harry Connick. During her tenure, she had ably performed her responsibilities of trying criminal cases. Then she was notified that she was to be transferred to a different section of criminal court, a move which she strongly opposed. She expressed her objections to several supervisors, including the District Attorney, but was unable to block the transfer. Myers then prepared a questionnaire soliciting the views of fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. The questionnaire was distributed to fifteen assistant district attorneys. The District Attorney then dismissed Myers, obstensibly for refusing the job transfer. Myers sued under 42 U.S.C. Sec. 1983, contending that her employment was wrongfully terminated because she had exercised her constitutional right of free speech. The district court agreed and directed that she be reinstated. The court expressly found that the questionnaire, not the refused transfer, was the real reason for Myers's dismissal. The court reasoned that the questionnaire involved matters of important public concern and that the state had not clearly demonstrated that the survey substantially interfered with the operations of the District Attorney's office. See Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). The court of appeals affirmed on the basis of the district court's opinion.
 
 
 41
 On certiorari, the Supreme Court reversed. Justice White began the opinion by citing Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in which the Court held that a public employee does not relinquish first amendment rights to comment on matters of public interest by virtue of government employment. Justice White noted, however, that in Pickering the Court was careful to explain that the state's interests in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Id. at 568, 88 S.Ct. at 1734. The task was to arrive "at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Ibid. The Court made clear, however, that if the expression did not involve a matter of legitimate public concern, no first amendment protection against discharge existed and no balancing was needed. Connick 461 U.S. at ---- - ----, 103 S.Ct. at 1689-1690, 75 L.Ed.2d at 719-720; Jones v. Dodson, 727 F.2d 1329 at 1334 (4th Cir.1984).
 
 
 42
 Applying the teaching of Pickering to the facts in Connick, the Court concluded that Myers's questionnaire did not, with one exception,[2] involve comment on matters of legitimate public concern, but rather dealt with problems of internal office policy. The state was not therefore required to offset the gravity of a first amendment claim with compelling proof that government functions were jeopardized by the exercise of speech.
 
 
 43
 In reaching the conclusion that Myers's speech was personal in nature, the Court wrote that "whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. at ----, 103 S.Ct. at 1690, 75 L.Ed.2d at 720. Here, it is beyond dispute that Lewis's complaints began upon learning that she would be assigned additional duties. The record as I view it is unequivocal that the motivation for her complaints was personal effrontery over being asked to do more work, not public-spirited concern over the administration of justice.[3] Cf. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (where teacher openly criticized Board of Education for its allocation of funds between athletics and education, subject of speech was a matter of public concern for which teacher could not be fired); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (teacher who testified before Texas legislature in favor of four-year status for a state college could not be terminated on that ground by Board of Regents which opposed the change); Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (first amendment protection applied where public employee spoke privately with her employer on subject of race discrimination in the workplace).
 
 
 44
 The seeds of this unseemly controversy can be discovered in Lewis's own deposition in which she admitted that she was not initially aware that Magistrates did their own typing and microfilming of documents. She learned this in the course of her training although she candidly admitted that "I don't like to microfilm."
 
 
 45
 Be that as it may, the day came when Blackburn issued the directive requiring the three civil magistrates to do additional microfilming. Lewis's reaction to this directive is instructive and illuminating. I can find no suggestion on her part that the quality of her work--judicial or otherwise--suffered. A careful reading of the record fails to disclose any expression of concern on Lewis's part about the impact that these added chores would have upon the public or the criminal justice system. She was disturbed only because she was going to have to do more work, and she wanted to avoid that by finding someone else upon whom to impose the burden.
 
 
 46
 I find her reactions interesting. At no time did she approach Blackburn, the source of her discomfort. Instead, she (1) sought to persuade her two colleagues to decline to do the additional microfilming while she sought to shift that responsibility to someone else (a proposal the other magistrates apparently rejected); (2) refused to carry out the Clerk's directions for two full working weeks; and (3) by that refusal, she caused the other magistrates and employees of the Clerk's office to do her work for her. She also publicly criticized the Clerk, but not to his face. It requires no imagination to suggest that this conduct on her part further ruptured her relations with the Clerk and the personnel in the Clerk's office (which Lewis conceded was not good), and that it did not endear her to her co-workers in the magistrates' corps.
 
 
 47
 As further evidence that Lewis was interested only in her own personal work load, her testimony reveals that in her opinion the additional microfilming required an additional one-half to one hour per day of her time, although she admitted that this was not true "every day." Her displeasure centered on her own overtime work and her inability to leave the office at 5:00 P.M. Her principal overtime complaint seems, however, to focus on a single week when one civil trial magistrate was on vacation and the other was on a special assignment training a new criminal magistrate.
 
 
 48
 The facts of our case, therefore, are even less conducive to a finding of "expression based upon public concern" than those at issue in Connick, where a public questionnaire dealing with a variety of issues was sent out to all employees. If the Supreme Court was not willing to find protected expression in that case, I am hard pressed to see how we can find it here.
 
 
 49
 Perhaps the root of my disagreement with the majority on this point lies in what I believe to be its erroneous assumption that a Magistrate under the North Carolina system is primarily a judge and that Lewis was unable to perform her judicial duties because she was being required to spend time microfilming. A Magistrate is "an officer of the district court"[4] who carries out some narrowly circumscribed judicial functions,[5] but the bulk of a magistrate's time is spent doing clerical work. I venture to say that the average Magistrate spends more than fifty per cent of his or her time sitting at a typewriter filling out criminal summonses, warrants for arrest, commitment papers, bond papers, small claims judgments, or one of the other documents and forms for which he or she is responsible. To my knowledge, no North Carolina Magistrate has ever been furnished clerical assistance, and all of them do their own typing.
 
 
 50
 Connick also held that "when employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the superior's view that the employee has threatened the authority of the employer to run the office." Id. 461 U.S. at ----, 103 S.Ct. at 1693, 75 L.Ed.2d at 724. This is precisely the situation I find here. Lewis chose a somewhat milder form of publicizing her grievances than did Sheila Myers, yet it cannot be said that disruption was not felt in the clerk's office. While it is true that there is no employer-employee relationship between the clerk and the magistrates (by statute, the magistrates report to the local chief district judge), operations of the two offices are intimately interwoven. Section 7A-175 of the North Carolina General Statutes states that "a magistrate shall keep such dockets, accounts, and other records, under the general supervision of the clerk of superior court, as may be prescribed by the Administrative Office of the Courts." Only three civil magistrates serve Mecklenburg County. The recalcitrance of one is patently disruptive to the effective operation of the local courts.
 
 
 51
 In short, I think that the sum and substance of Georgia Lewis's complaint was that she had too much work to do and could not absorb additional duties. While I am sympathetic to her grievance, I find in her protest only matters of self-interest rather than issues of public concern.[6]
 
 II.
 
 52
 The opinion of the district court implies a finding that Snepp refused to reappoint Lewis partly because she gained a judgment against Blackburn in federal court. This is difficult to reconcile with Snepp's uncontradicted testimony that he had formed the opinion at least as early as September 8, 1982, three and one-half months before the appointment deadline (and two and one-half months before Lewis obtained the judgment against Blackburn) that he would not appoint Lewis because she was a malcontent. Despite this, Lewis contends that Snepp's action violated her first amendment right to petition the government for a redress of grievances. I reject this position. It was not Lewis's act of filing suit or obtaining judgment against Blackburn that triggered Snepp's emphatic response; it was, rather, the nature of the order issued by the federal district court that offended the state judge. The district court found that under prevailing state custom in appointing magistrates, the senior resident superior court judge defers to the preference of the clerk, although by statute the ultimate decision rests with the judge. The district court's order to Blackburn to renominate Lewis and to tell Snepp that the nomination was "for real" presumed to strip Snepp of his independent judgment concerning whom to appoint. This was interpreted as an unwarranted intrusion by Judge Snepp, notably serious in the context of federal court intervention in the functioning of state tribunals. Furthermore, Snepp correctly perceived the error in the district court's holding, that Lewis's speech was in fact not related to matters of public interest and, therefore, could not shield her from non-reappointment. Connick subsequently confirmed Snepp's reading of the law. The combination of an erroneous legal ruling and over-reaching relief[7] explains, if it does not fully justify, Snepp's response.
 
 
 53
 Finally, I do recognize the protected status of Lewis's conversation with her state representatives concerning the possibility of procuring additional legislative aid for the magistrate corps; however, there is no suggestion that Snepp and Blackburn held this against her. Snepp testified without rebuttal that he supported Lewis's efforts to acquire funding for staff from the General Assembly.
 
 III.
 
 54
 I am convinced that Georgia Lewis failed to gain reappointment as magistrate because she strenuously protested matters bounded by her immediate self-interest, not matters of public concern. I would reverse the judgment of the district court.
 
 
 
 *
 Honorable Bailey Aldrich, Senior United States Circuit Judge for the First Circuit, sitting by designation
 
 
 [1]
 The constitutional prohibition against government infringement of speech applies to states under the Fourteenth Amendment. See Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1975)
 
 
 [2]
 By contrast, in Lynch v. Snepp, 472 F.2d 769 (4 Cir.1975), on which defendants mistakenly rely, state proceedings in which plaintiff's claim could be adjudicated were currently pending when suit was instituted in a federal district court. That fact distinguishes Lynch from this case and makes Lynch inapposite
 
 
 [3]
 The district court found that Lewis did have a legitimate expectation of reappointment to, and hence a property interest in, her position as a magistrate. He based this conclusion on Judge Snepp's testimony that he almost invariably reappointed incumbents specifically in order to give them some sense of tenure. We do not, however, find it necessary to rest on this finding
 
 
 [4]
 On the other hand, those cases plainly state that public employees do not have carte blanche to speak about matters that are not of interest to the general public, and that employment may, in certain circumstances, be conditioned on both content and context-based restrictions where necessary to the effective functioning of government
 
 
 [5]
 The district court found, as a fact, that the Clerk indeed did lack the authority to issue the microfilming order. The plain language of the state statute and regulations indicate that the Clerk lacked the authority
 
 
 [6]
 See United Mine Workers v. Illinois State Bar Ass'n, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967)
 
 
 [1]
 The protected status of speech is a question of law for the court to decide. Connick v. Myers, 461 U.S. ----, ---- n. 7, 103 S.Ct. 1648, 1690 n. 7, 75 L.Ed.2d 708, 720 n. 7 (1983)
 
 
 [2]
 The Court agreed that the problem of political patronage, particularly pressure to join political campaigns, was a matter of public concern. That issue is not present in this case
 
 
 [3]
 The district court found that Lewis "did not feel that she should stop doing her judicial work and start doing microfilming for the Clerk."
 
 
 [4]
 N.C.G.S. Sec. 7A-170
 
 
 [5]
 N.C.G.S. Secs. 7A-211; 7A-273; 7A-292
 It should be noted that many of these functions, including the hearing of "small claims actions," can be performed by a Magistrate only if the chief district judge, in his discretion, permits the Magistrate to do so.
 
 
 [6]
 In light of my view that the genesis of this case was an internal dispute devoid of public interest, it makes no difference who was right substantively on the issue of whether Blackburn had power to assign microfilming duties. As the Connick Court makes clear, sometimes antagonistic employees are fired (or in this case, not renominated for their posts) although the employer is in the wrong on a matter of office policy. Connick, 461 U.S. at ---- - ----, 103 S.Ct. at 1689-90, 75 L.Ed.2d at 719-20
 
 
 [7]
 I need not concern myself with whether it would ever be appropriate as a part of fashioning a suitable remedy for a federal judge to order a state judge to appoint a specific individual to a state office when the power of appointment is discretionary and is vested in the state judge, but such an order is not justified under the circumstances of this case