**Edwin G. PIVER, Plaintiff–Appellant,**

v.

**PENDER COUNTY BOARD OF EDUCATION; Billy O. Rivenbark; Wilbert Henry; Charles F. Sidbury; J.J. Smith; R.E. Brown individually and as a member of the Pender County Board of Education; M.D. James, individually and as Superintendent of Schools of Pender County, Defendants–Appellees,**

**Pender County Schools, Defendant.**

No. 87–2536.

United States Court of Appeals, Fourth Circuit.

Argued July 2, 1987.

Decided Dec. 22, 1987.

William Robert Shell, Wilmington, N.C., for plaintiff-appellant.

Richard Allen Schwartz (Tharrington, Smith & Hargrove, Raleigh, N.C., on brief), for defendants-appellees.

Before PHILLIPS, ERVIN, and WILKINSON, Circuit Judges.

ERVIN, Circuit Judge:

This action for damages under 42 U.S.C. § 1983 (1982) was brought by a high school teacher who spoke out in support of tenure for his principal. The principal was later discharged, and the teacher was reassigned to a junior high school some forty miles from his home. The transfer never took place, however, because the teacher signed a statement of support for his new principal and the school board gave him back his original job. The teacher nevertheless sued, arguing that the state had taken adverse action against him because of the exercise of his first amendment right of free speech. The district court granted summary judgment for the defendants on the theory that the content of the teacher's speech was not a matter of public concern, and hence was not constitutionally protected. We reverse on that issue: the speech concerned matters of central importance to the public. We remand for consideration whether the teacher compromised and settled his claim against the defendants by signing the statement and returning to his original job.

## I.

Plaintiff-appellant Piver is a career social studies teacher employed by the defendant Pender County Board of Education (hereafter "the school board"). Piver worked at all times relevant to this action at the Topsail High School. In April, 1982, by a vote of four to one, the school board elected not to renew the contract of R.J. Jourdan, the principal at Topsail High School. The issue of Jourdan's contract had been the topic of extensive discussion at the high school prior to the school board's decision. Piver, along with several other faculty members, supported Jourdan. The chairman of the school board, J.J. Smith, was in favor of refusing to renew Jourdan's contract. Smith and Piver were related by marriage.

Piver spoke on behalf of Jourdan and the other teachers who favored Jourdan at a public meeting in April, 1982, before the school board vote. The meeting was called for the purpose of soliciting comments on Jourdan's tenure decision. After the school board decided not to renew Jourdan's contract, Piver joined with other faculty and community members to urge the school board to reverse its decision. He also allowed discussion of the issue and the circulation of a petition in support of Jourdan in his classroom. The school board, however, persisted in refusing to renew Jourdan's contract.

In June, 1982, a non-partisan election was held in Topsail Beach for the school

board. Three incumbents ran for office, including chairman Smith. The record reveals that Piver himself, while personally opposed to the two incumbents who voted against Jourdan, did not participate in any campaigns against the incumbents. Piver's wife, however, actively campaigned on behalf of the challengers. The two incumbents who voted against Jourdan's reappointment, including chairman Smith, were defeated.

In July, 1982, Piver was reassigned by the school board, still headed by the lame duck chairman Smith, to a junior high school located approximately forty miles from his home. The school board members explained to Piver that they were concerned that he had been engaging in activities that were divisive and disruptive for the students during the controversy over Jourdan's contract. Piver filed a grievance and asked that the transfer be rescinded. In August, 1982, Piver reached an agreement with the school board whereby he remained at Topsail High School in exchange for signing a statement of support for the new principal at Topsail.[1] The statement that was ultimately signed was the product of negotiations between Piver's attorney and counsel for the school board. Piver's attorney[2] testified that Piver understood the statement to be an alternative to remaining at the distant junior high school and filing suit against the school board. The attorney, in a deposition, appeared to assert that Piver was given his old job in consideration for signing the statement.

Approximately one year later, Piver retained different counsel for the purpose of having the statement of support removed from his personnel file. The school board agreed to remove the statement. In 1986, Piver retained his current counsel and filed suit against the school board, several indi-

vidual members of the school board, and the superintendent of schools. The suit sought damages under 42 U.S.C. § 1983 (1982) for violation of Piver's rights under the first and fourteenth amendments to the United States Constitution, for violation of the equal protection clause of the fourteenth amendment to the United States Constitution, and for conspiracy to violate his constitutional rights under 42 U.S.C. § 1985(3) (1982). The claims against the Pender County Schools, the equal protection claim, and the conspiracy claim were dismissed by the district court pursuant to Fed.R.Civ.P. 12(b)(6). The district court later granted summary judgment for the defendants on Piver's claims under § 1983 and the first and fourteenth amendments. It is from that summary judgment that Piver appeals.

## II.

When a public employee claims to have suffered discrimination because of the employee's exercise of rights guaranteed by the first amendment to the United States Constitution, a court reviewing that claim must pursue a two-step analysis. First, the court inquires whether, as a matter of law, the speech was constitutionally protected. Speech is constitutionally protected only if it relates to matters of public concern, *see Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983), and if the interests of the speaker and the community in the speech outweigh the interests of the employer in maintaining an efficient workplace. *See Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

## A.

Speech that cannot "be fairly considered as relating to any matter of political, social, or other concern to the community," *Con-*

---

1. The statement, dated August 10, 1982, read as follows:

   Gentlemen:
   You have my assurance that I will cooperate fully with Mr. Thomas C. Benton, the new principal at Topsail High School, that I will perform my teaching duties and assigned responsibilities to the best of my ability, and that I will support

the Board of Education in the implementation of its policies and decisions.
   Sincerely yours,
   /s/ Edwin G. Piver

2. Gary E. Trawick was the attorney who represented Piver in the negotiations and who testified concerning the statement. Piver is currently represented by different counsel.

*nick,* 461 U.S. at 146, 103 S.Ct. at 1689, or that concerns "matters bounded by [one's] immediate self-interest," *Lewis v. Blackburn,* 734 F.2d 1000, 1012 (4th Cir.1984) (Ervin, J., dissenting) (dissenting opinion adopted by court en banc, 759 F.2d 1171 (4th Cir.1985)), is not of public concern and therefore not protected by the first amendment. The district court, reading *Lewis* for the proposition that "disputes relating to personnel matters, such as the decision to grant tenure to a principal, have been held to be matters of private rather than public concern," held that Piver's speech was unprotected.

In *Pickering,* the Court held impermissible under the first amendment the dismissal of a high school teacher for openly criticizing the Board of Education for its allocation of school funds between athletics and academics and its methods of informing taxpayers about the need for additional revenue. The Court said that "free and open debate" about whether a school system requires additional funds "is vital to informed decision-making by the electorate." *Pickering,* 391 U.S. at 571–72, 88 S.Ct. at 1736. A teacher in a state college system who testified before committees of the legislature and became involved in a debate over changing his college to four-year status was engaged in speech that raised public concerns. *See Perry v. Sindermann,* 408 U.S. 593, 598, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972). A teacher who relayed to a radio station the substance of a memorandum relating to teacher dress and appearance that the principal had circulated to various teachers was also engaged in speech involving a matter of public concern. *See Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, at 284, 97 S.Ct. 568, at 574, 50 L.Ed.2d 471 (1977); *see also Lewis v. Harrison School District No. 1,* 805 F.2d 310 (8th Cir.1986) (school principal's speech to school board involving proposed transfer of his wife, an English teacher, involved issues of public concern), *cert. denied,* — U.S. —, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987); *Wren v. Spurlock,* 798 F.2d 1313, 1317 (10th Cir.1986) (teacher's filing of grievances against principal involved topics

of public concern), *cert. denied,* — U.S. —, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987).

The *Connick* Court established that the test for the existence of speech on matters of public concern involves inquiry into the "content, form and context" of a given statement. 461 U.S. at 147–48, 103 S.Ct. at 1690. *Connick* did not hold that speech relating to employment grievances is always a personal matter; such a view would conflict with the Court's commitment to case-by-case balancing. *See Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979) (criticism in private of the public employer's allegedly racially discriminatory policies can be of "public concern"); *see also McKinley v. City of Eloy,* 705 F.2d 1110, 1114–15 (9th Cir.1983) (policeman who was fired because of speech dealing with pay for city's police force raised a "public concern"); *Collins v. Robinson,* 568 F.Supp. 1464, 1468 (E.D. Ark.1983) (policeman fired for writing a memo to his sheriff that criticized the behavior of the policeman's immediate superior held to have raised a public concern), *aff'd,* 734 F.2d 1321 (8th Cir.1984); *Developments in the Law—Public Employment,* 97 Harv.L.Rev. 1611, 1769 (1984).

This court has elaborated on *Connick's* "public concern" test:

> *Pickering,* its antecedents, and its progeny—particularly *Connick*—make it plain that the "public concern" or "community interest" inquiry is better designed—and more concerned—to identify a narrow spectrum of employee speech that is not entitled even to qualified protection than it is to set outer limits on all that is. The principle that emerges is that *all* public employee speech that by content is within the general protection of the first amendment is entitled to at least qualified protection against public employer chilling action except that which, realistically viewed, is of purely "personal concern" to the employee—most typically, a private personnel grievance.... The focus is therefore upon whether the "public" or the "community" is likely to be truly concerned with or interested in

the particular expression, or whether it is more properly viewed as essentially a "private" matter between employer and employee.

*Berger v. Battaglia*, 779 F.2d 992, 998–99 (4th Cir.1985) (citations omitted). In excluding "private personnel grievances," the court in *Berger* screened out cases in which the aggrieved employee himself has spoken out about his own employment situation when that employment situation holds little or no interest for the public at large.

In *Jurgensen v. Fairfax County*, 745 F.2d 868, 878–79 (4th Cir.1984), we held that a policeman who was demoted for surreptitiously giving an internal police department audit report to a journalist did not have his right of free speech violated. We held that the audit was not a matter of public concern. *Id.* at 888, 891 (Ervin, J., concurring). The contrast between the "content, form and context" of the speech in *Jurgensen* and the speech in the instant case illuminates the boundary of public employee speech that is constitutionally protected.

The content of the speech in *Jurgensen* concerned internal grievances about working conditions: the length of time on the job, the number of breaks that employees received, and so forth. The substance of Piver's speech, in contrast, centered on the adequacy of Jourdan's performance as principal of the high school, an issue in which Topsail Beach parents were vitally interested.

The form of the speech in *Jurgensen* involved the handing over of a report, taken from someone else's files, owned by the employer, and not prepared by the speaker, to a journalist at a private dinner meeting. The forms of Piver's speech included an oral presentation of his own thoughts at a public school board meeting, the guiding of class discussion and participation in his social studies class, and private conversations with the chairman of the school board and with other teachers.

The context of the speech in *Jurgensen* included a department regulation forbidding the release of information by employees of the police department without specif-

ic prior authorization. The context of Piver's speech was fundamentally different. The speech took place primarily in a public meeting called for the purpose of discussing Jourdan's tenure. The speech delivered information uniquely available to Piver; as a teacher under Jourdan, Piver had important insights into Jourdan's performance on the job. The speech was directed to a small community in which the speaker and the subjects of his speech were personally known by almost everyone.

Piver's speech clearly addressed matters of public concern. He spoke out on a matter in which the community of Topsail Beach was vitally interested. The subject of his speech was of much wider importance than a mere "private personnel grievance" like those raised in *Connick, Lewis* and *Jurgensen.*

Piver's support for Jourdan appears not to have been motivated by self-interest, as was the district attorney's survey in *Connick* or the magistrate's protestations in *Lewis v. Blackburn.* His support was simply the informed viewpoint of a concerned faculty member. This sort of speech must not be chilled. Teachers should have an important voice in decisions about the employment of school officials, because teachers are in one of the best positions from which to judge the officials' competence. The district court erred in holding that Piver's speech did not address an issue of public concern.

## B.

*Pickering* teaches that a public employee's speech is not constitutionally protected, even if it addresses an issue of public concern, unless the employee's and the audience's interests in the speech at issue outweigh the harm caused by the speech to the defendants' interests in running the governmental office efficiently. In this case, Piver spoke once to an open meeting of the school board and the Topsail School Advisory Council; he attended a Board meeting after the decision not to award Jourdan tenure, but he did not speak at that meeting; he met privately with the chairman of the school board on three occa-

sions to discuss Jourdan; he allowed students to discuss the issue during class time; and he allowed a petition in support of Jourdan to be circulated in his class, a class in social studies that apparently included training in civics.

*Pickering* gives several specific examples of legitimate employer concerns that might be threatened by particular forms of speech: discipline and harmony in the workplace, confidentiality, protection from false accusations that may prove difficult to counter given the employee's supposed access to inside information, freedom to discharge an employee whose speech has impeded the proper performance of his duties or is so lacking in foundation as to call his competence into question, and protection of close working relationships that require loyalty and confidence. 391 U.S. at 568–73, 88 S.Ct. at 1734–37. In *Connick*, the Court mentioned the need for harmony in the office or work place; whether the government's responsibilities require close working relationships to exist between the plaintiff and co-workers; the time, place and manner of the speech; the context in which the dispute arose; the degree of public interest in the speech; whether the speech impeded the employee's ability to perform his or her duties; and whether the employer has exercised the discretion necessary for the proper management of internal affairs and personnel decisions. 461 U.S. at 150–51, 103 S.Ct. at 1691–92.

The extant case law devotes less attention to delineating the employee's interests in discussing matters of public concern and the public's interest in hearing such discussion. *See Developments in the Law—Public Employment,* 97 Harv.L.Rev. at 1760. At base, of course, is the fundamental concern that the first amendment manifests "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). As has been pointed out by one distinguished commentator, the value of freedom of speech, the Constitution's "most majestic guarantee," is so high that it cannot be adequately described in purely instrumental terms. L. Tribe, *American Constitutional Law* § 12–1, at 576 (1978).

■ Certain features of Piver's speech clearly enhance its importance to him and to the public. First, part of the speech took place at a public meeting called for the very purpose of soliciting opinions on Jourdan's tenure decision. Both the employee and the public are centrally interested in frank and open discussion of agenda items at public meetings. Second, Piver had particular expertise on the issue of Jourdan's performance. The public has a need to hear from those who know concerning the performance of public officials. Third, weighing against the charge that Piver's actions disrupted the classroom is his interest as a teacher in engaging his social studies students in issues of interest to the community. Although a teacher must obviously be wary of attempting to communicate his personal prejudices on issues that have more than one side, there is no indication in the record that Piver tried to propagandize his views. Instead, the record indicates that Piver merely allowed the students to discuss the issue and to use class time to organize their own petition drive in support of Jourdan. These factors add up to an exercise of first amendment rights in which both Piver and the community were vitally interested.

In contrast to the weighty interests supporting Piver's speech, the school board asserted only a threat of "turmoil" at the school. Although discipline and harmony in the work place are factors mentioned in *Pickering* and *Connick,* the threat to those values presented by Piver was clearly less worrisome than the interests trampled by the reprisal against Piver.

The district court never considered or passed upon the second prong of the *Pickering–Connick* inquiry—the "balancing" inquiry. We have addressed it, however, because it is a question of law and we are

persuaded that the record below is sufficient to enable us to do so correctly. We therefore hold that the balance tipped in Piver's favor, and that this does not furnish an alternative basis for affirming the judgments.

## III.

We next consider the question whether Piver has demonstrated any compensable damages for the alleged violation of his first amendment rights. Piver never actually was forced to transfer to a new job; he was reassigned to his original position after he signed the statement of support for the new principal.

The basic purpose of damages under 42 U.S.C. § 1983 is compensatory. *See, e.g., Carey v. Piphus,* 435 U.S. 247, 254–55, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978). The measure of damages under § 1983 must be based on the interests designed to be protected by the right that was violated; it is not a simple matter of applying damage formulas from tort law, or quantifying out-of-pocket expense. *Id.* at 258, 98 S.Ct. at 1049; *Memphis Community School District v. Stachura,* 477 U.S. 299, ——, 106 S.Ct. 2537, 2547, 91 L.Ed.2d 249 (1986) (Marshall, J., concurring). For example, substantial damages have been allowed in cases in which a person's right to vote was infringed, despite the plaintiff's inability to prove out-of-pocket expense. *See Carey,* 435 U.S. at 264–65 n. 22, 98 S.Ct. at 1053 n. 22. However, an award of substantial compensatory damages, as opposed to nominal damages, must be proportional to the actual injury incurred. Nominal damages may be awarded for any § 1983 violation. *See, e.g., Bell v. Little Axe Independent School District No. 70,* 766 F.2d 1391, 1408–13 (10th Cir.1985); *Hobson v. Wilson,* 737 F.2d 1, 57–63 (D.C.Cir.1984) (award of $3125 in compensatory damages for indirect first amendment violations held excessive), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *Kincaid v. Rusk,* 670 F.2d 737, 745–46 (7th Cir.1982) (allowing nominal damages of $1 for denial of access to reading material in prison); *Dellums v. Powell,* 566 F.2d 167, 196 (D.C.

Cir.1977) (award of $7500 for actual loss of an opportunity to demonstrate held excessive); *Tatum v. Morton,* 562 F.2d 1279, 1282–84 (D.C.Cir.1977) (award of $100 insufficient to compensate interruption of Quaker vigil in front of the White House). Substantial damages may be presumed in cases in which the actual proof of damages would be difficult or impossible. *See, e.g., Mickens v. Winston,* 462 F.Supp. 910, 913 (E.D.Va.1978) (awarding presumed damages of $250 for racial segregation in prison), *aff'd mem.,* 609 F.2d 508 (4th Cir. 1979).

Punitive damages are allowed in a proper § 1983 case to punish defendants who act with a malicious intent to deprive plaintiffs of their rights or to do them injury, *see Carey,* 435 U.S. at 257 n. 11, 98 S.Ct. at 1049 n. 11, or with reckless or callous indifference to the federally protected rights. *See Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). A punitive award may accompany either a nominal award or a substantial compensatory award.

In the context of first amendment violations, the concurring opinion in *Stachura* quoted with approval the opinion of the United States Court of Appeals for the District of Columbia Circuit in *Hobson:* injury to a protected first amendment interest can itself constitute compensable injury wholly apart from any "emotional distress, humiliation and personal indignity, emotional pain, embarrassment, fear, anxiety and anguish" suffered by plaintiffs. *Hobson,* 737 F.2d at 62 (footnotes omitted), *quoted in Stachura,* 477 U.S. at ——, 106 S.Ct. at 2547, 54 U.S.L.W. at 4775 (Marshall, J., concurring). But such injury can be compensated with substantial damages only to the extent that it is "reasonably quantifiable"; damages should not be based on the "so-called inherent value of the rights violated." *Stachura,* at ——, 106 S.Ct. at 2547, 54 U.S.L.W. at 4775 (Marshall, J., concurring). The award must focus on the real injury sustained and not on either the abstract value of the constitutional right at issue, *see Carey,* or the importance of the right in our system of government, *see Stachura.*

On remand, if the district court determines that Piver did not compromise and settle his claim against the defendants, then the court must analyze the damages that Piver incurred in terms of the injury to the interests protected by the first amendment.

### IV.

The final question on appeal is whether Piver's signing of the statement of support in exchange for a return to his old job constituted a compromise and settlement of his claim against the defendants. A disputed or doubtful claim can be discharged and satisfied by some substituted performance; when an agreement is made to discharge a disputed claim and the agreement is performed, the claim is said to have been compromised and settled.[3] A compromise and settlement may act as a bar to further action on the antecedent claim that forms the basis of the compromise. *See* 15A Am. Jur.2d *Compromise and Settlement* § 24 (2d ed. 1976). If the claim that was compromised could have sought a different remedy, such as an action for damages rather than the injunction that Piver originally threatened to seek, then the compromise can act as a binding election of remedies. *Id.*

A compromise and settlement requires an offer and acceptance, consideration, and parties who have the capacity and authority to contract. *See, e.g.,* 15A Am.Jur.2d, *Compromise & Settlement* § 7, at 779 (1976). We need not reach the question of whether federal or state law governs the formation of any settlement agreement, because the controlling factor must in either event be the intentions of the parties.

Although the relinquishment of a claim may be valid consideration, *see, e.g.,* 1 A. Corbin, *Corbin on Contracts* § 140, at 595 (1963), the court must inquire into whether the claim was in fact relinquished in exchange for adequate consideration and in the knowledge, actual or imputed, that a compromise was being executed. It is not necessary that the "minds of the parties" subjectively "meet," only that they make "mutual expressions of assent to the exchange." *Id.* at § 107. Action taken by a party that is inconsistent with the rejection of an offer of compromise may be interpreted as acceptance of the compromise. For example, one who cashes a check with the knowledge that the check was offered as a final settlement of a claim will be held to have compromised and settled the claim, despite having scratched out the words "in final settlement" on the face of the check. *See, e.g.,* 6 A. Corbin, *Corbin on Contracts* § 1279, at 130–31 (1962).

■ In our view, this record is inadequately developed to decide on appeal whether Piver's signing of the statement of support barred his later action under § 1983. There is evidence that the school board's offer of reassignment to Topsail High School was made in consideration of Piver's signing the statement, and there is evidence that Piver and his attorney understood the signing of the statement to be an alternative to litigation, but there has been no factual finding that Piver and the school board actually intended these events to compromise and settle Piver's claims against the school board. On remand, the district court should make such a determination and consider whether the compromise, if it existed, was made without duress, fraud, and mistake and was supported by fair consideration.

### V.

The case is accordingly remanded to the district court for such a determination.

**REVERSED AND REMANDED.**

---

3. Compromise and settlement is, therefore, a subset of the larger class of "accord and satisfaction." Any claim, including a certain, liquidated and undisputed claim, can be discharged by accord and satisfaction, but only disputed claims are discharged by means of compromise and settlement. *See* 6 A. Corbin, *Corbin on Contracts* § 1278, at 124 (1962).