Margaret Ann PIERSON, et
al., Plaintiffs,

v.

James A. GONDLES, Jr., et
al., Defendants.

Edythe L. BUDD, Plaintiff,

v.

James A. GONDLES, Jr., et
al., Defendants.

Elmer L.H. LOWE, Sr., Plaintiff,

v.

James A. GONDLES, Jr., et
al., Defendants.

Leroy SIMONSON, Plaintiff,

v.

James A. GONDLES, Jr., et
al., Defendants.

Civ. A. Nos. 87–1372–A, 88–0118–A
to 88–0120–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 11, 1988.

Victor M. Glasberg, Jonathan M. Smith,
Alexandria, Va., for plaintiffs.

William B. Dolan, III, Kenneth C. Bass, III, McLean, Va., Peter H. Maier, Asst. County Atty., Arlington, Va., for defendants.

## MEMORANDUM OPINION

CACHERIS, District Judge.

Before the court is the motion of defendants Arlington County Sheriff James A. Gondles, Jr. and Deputy Sheriff Thomas N. Faust's for partial summary judgment against an award of damages arising from any alleged violation of plaintiffs' First Amendment or Fourteenth Amendment rights.[1] As grounds for the motion, defendants assert the qualified immunity defense. For the reasons set forth below, the Motion is GRANTED.

The impetus to the lawsuit underlying this motion was the bitter and heated 1987 campaign and election for Sheriff of Arlington County. The plaintiffs are former and present Arlington County deputy sheriffs who allege that they were demoted in retaliation for their support of Gondles' opponent. Plaintiffs also claim that the Sheriff violated their due process rights by failing to follow the proper procedures before demoting them.

### Background [2]

All the plaintiffs in this action have worked as deputy sheriffs in Arlington County office for several years. Margaret Ann Pierson has been employed since January 20, 1981. In August, 1985, she was promoted to the rank of Sergeant and given the position of Correctional Supervisor in charge of several deputies.

Richard Charles Tanner has been a Deputy Sheriff since July 12, 1982, and became a Sergeant in July, 1986. Prior to his demotion, Tanner was the night shift Correctional Supervisor for the jail. Tanner has since resigned from the Sheriff's office.

Robin Faye Whitmore has been a Deputy Sheriff since May, 1981. In February, 1984, she became a Classification Counselor. Sean Eldon Whitmore, Robin Whitmore's husband, has served as a Deputy Sheriff since January 11, 1982, and on January 22, 1984, he was promoted to the position of Security Officer. A Security Officer's responsibilities include providing security for the courthouse and the County Board, transporting inmates to and from the court, conducting internal investigations and arresting fugitives pursuant to bench warrants. During the course of this litigation, Sean Whitmore resigned his position.

Edythe L. Budd was a Shift Supervisor employed by the Arlington County Sheriff's Department. Deputy Sheriff Leroy Simonson was a Transportation Officer, a position classified as a Correctional Officer. Elmer L.H. Lowe, Sr. held the position of Warrant Process Officer.

Defendant James A. Gondles, Jr. has been the duly elected Democrat Sheriff of Arlington County since 1979. Defendant Thomas Faust presently serves as the Chief Deputy Sheriff.

Ron Hager served as Gondles Chief Deputy Sheriff until he resigned in March, 1987, to run against Gondles in the 1987 election. The political contest was heated, and Hager charged Gondles with mismanagement, abuse of power, and lack of integrity.

Several Arlington County Deputy Sheriffs were solicited by Hager supporters to sign a statement granting Hager permission to use their name in support of the campaign.[3] As a result of this authorization, Hager's campaign committee prepared

---

**1.** On February 1, 1988, this court, by Memorandum Opinion and Order denied plaintiffs Margaret A. Pierson, Sean Whitmore, Robin Whitmore, and Richard Tanner's Motion for Preliminary Injunction.

**2.** The Court has incorporated herein certain factual findings that were made in the preliminary injunction opinion. This court realizes that a dispute exists as to whether the plaintiffs were completely straightforward in their testimony at that time. However, the questioned testimony does not impact the factual findings relevant to the court's decision on the summary judgment motion.

**3.** The release stated:

I am supporting Ron Hager for Arlington County Sheriff in the election to be held on November 3, 1987. It is my judgment that Ron

a flyer which incorporated the signatures and contained serious allegations concerning the Sheriff's performance in office. In particular, the flyer charged the Sheriff with "mismanagement and abuse of power" and implied that the Sheriff lacked integrity.[4] The names of twenty-three present or former Arlington County Deputies appeared on the flyer, including five of the plaintiffs in the present action.[5] The flyer was available throughout Arlington County, mailed to the voters and published in local newspapers on October 30, 1987.

Besides allowing the use of their names, all the plaintiffs played active roles in the Hager campaign. Their support for Hager included contributing money to his campaign, working telephone banks and making calls for his benefit. Despite these efforts, Gondles was re-elected Sheriff on November 3, 1987.

On December 28, 1987, each of the plaintiffs was called for individual meetings with Sheriff Gondles and given demotion letters. The letters given to the plaintiffs whose names appeared on the Hager flyer stated in part:

> has the management skills and expertise to be the best Sheriff Arlington voters could elect this year.
> I hereby give my permission for the Hager for Sheriff campaign to use my name publicly in support of Ron Hager's candidacy.
> Signature: _____
> Date: _____

Plaintiffs Margaret Pierson, Robin Whitmore, Sean Whitmore, Leroy Simonson, and Richard Tanner signed the release.

**4.** The flyer stated:
> Dear Arlington Voter:
> As Deputies in the Arlington County Sheriff's Office, we thought you'd like to know who *we* think the next Sheriff should be.
> As you can imagine, it's not easy to speak out against Jim Gondles, the current Sheriff. We're all taking a big risk.
> But just as Ron Hager believed he had to resign as Arlington's Chief Deputy to expose the mismanagement and abuse of power by Gondles, we feel strongly that you have a right to know who the best man for Sheriff is—from people who *know.*
> That's why we're supporting Ron Hager for Arlington Sheriff this year. Because we *know* what it takes to get the job done right.
> Believe us, *Ron Hager will be a Sheriff who will restore integrity and no-nonsense* to that office.

Recently you signed a statement which implied that I was guilty of mismanagement and lack of integrity and that I abused my power as Sheriff. While each individual has the right to support freely the candidate of his or her choices—or to make no choice—your actions in the campaign have clearly demonstrated your lack of confidence in my administration and your sharp disagreement with existing policies in the Sheriff's office.

As for the other two deputies, their letters cited their actions in support of the Sheriff's opponent as grounds for demotion.[6]

The terms of all of the deputy sheriffs expired on December 31, 1987. *See* Va. Code Ann. § 15.1–48. In the letters, each of the Deputies was given the option of either accepting reappointment at the same pay, albeit at lower positions, or being terminated from the Sheriff's department. The plaintiffs were all offered positions with diminished responsibility. The reassignment, in essence, was tantamount to a demotion. All the plaintiffs accepted the re-assignment.[7] Subsequently, plaintiffs

> We strongly urge you to vote for Ron Hager for Sheriff on November 3. We're proud to support Ron, and we know you will be too.

**5.** Plaintiffs Pierson, Tanner, Sean and Robin Whitmore testified at the Preliminary Injunction hearing that they disavowed the ad. Subsequently, they indicated that their testimony was not truthful in that regard, and that they believed the contents of the ad. Their change in testimony does not affect the outcome of this Motion.

**6.** The letter to Elmer L.H. Lowe, Sr. stated:
> Recently you personally distributed a flyer in which you implied that I was corrupt, that I abused my power as Sheriff, and that I don't take the black community seriously.

Edythe L. Budd's letter stated:
> Recently you distributed campaign materials including copies of a direct mail and newspaper campaign which implied that I was guilty of mismanagement and lack of integrity and that I abused my power as Sheriff.

**7.** Plaintiffs Margaret Pierson, Robin Whitmore, Sean Whitmore and Tanner moved for a Temporary Restraining Order which was denied on December 31, 1987.

Tanner and Sean Whitmore resigned their positions and no longer serve as deputy sheriffs.

In addition to the seven plaintiffs, other deputies were reassigned by Gondles in December, 1987. Some of the reassigned deputies had not signed the flyer which had criticized the Sheriff's performance. Several of the deputies who had been reassigned, including some of the plaintiffs, suffered no loss of pay or benefits.

### Qualified Immunity [8]

An "action for damages may offer the only realistic avenue for vindication of constitutional guarantees," when government officials abuse their power. *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). This notion is tempered by the realization that "damage suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton,* ─ U.S. ─, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

To balance these concerns in an efficient manner, the Supreme Court has repeatedly reiterated its goal of dispensing insubstantial claims prior to trial. *Harlow,* 457 U.S. at 816–18, 102 S.Ct. at 2737–38. The mechanism for achieving this goal is the qualified immunity defense. The parties agree that the relevant standard for examining the qualified immunity issue is succinctly stated in the *Harlow* decision:

> [G]overnment officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738. The trial judge "appropriately, may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Id.* For a right to be "clearly established,"

"[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 107 S.Ct. at 3039.

Defendants raise the defense of qualified immunity on the grounds that it was not clearly established that the personnel actions taken by the Sheriff would violate the deputies' constitutional rights. In a practical sense, the court must return to December 1987 and divine how an attorney would have advised the Sheriff on the constitutionality of retaliatory personnel actions against the plaintiffs.

### A. FIRST AMENDMENT CLAIMS

Plaintiffs contend that their demotions constitute a violation of their First Amendment right to free speech. The court's examination of this issue is aided by the recent decision in *McConnell v. Adams,* 829 F.2d 1319 (4th Cir.1987), which allowed the qualified immunity defense to bar a claim of free speech infringement raised by a discharged public employee. To be entitled to the defense, "[p]ublic officials must consider the possible relevance of legal principles established in analogous legal contexts," however, the qualified immunity defense should be sustained "in cases where there is a legitimate question whether those principles extend the particular case before the court." *Id.* at 1325.

A long line of Supreme Court cases has developed the applicable standard for evaluating a government employee's free speech rights. In *Piver v. Pender County Board of Education,* 835 F.2d 1076 (4th Cir.1987), the Fourth Circuit provided the latest restatement for determining whether a public employee has been discriminated against for exercising First Amendment rights. A trial court must engage in a two-step analysis:

> [T]he court inquires whether, as a matter of law, the speech was constitutionally protected. Speech is constitutionally protected only if it relates to matters of

---

8. An instructive and detailed discussion of the development and evolution of the qualified immunity doctrine appears in *Hansen v. Meese,* 675 F.Supp. 1482, 1485–86 (E.D.Va.1987).

public concern, and if the interests of the speaker and the community in the speech outweigh the interests of the employer in maintaining an efficient workplace.

*Id.* at 1078 (citations omitted).

For the purposes of this qualified immunity motion, the court must resolve whether it was "clearly established" that the actions the Sheriff undertook trammeled upon the deputies' constitutionally protected speech. The court's analytic framework for resolving this issue is to determine first whether the speech is on a "matter of public concern." Second, the interests of the Sheriff in fulfilling his responsibilities as a public official are explored. Finally, the court undertakes the difficult task of balancing these interests.

### 1. *Nature of the Public Speech*

■ Acceptance of public employment does not eliminate an individual's free speech rights. In fact, "[t]he first amendment is implicated whenever a government employee is disciplined for his speech."[9] Nevertheless, a public employee's speech is constitutionally protected only if it relates to "matters of public concern." *See Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). The "test for the existence of speech on matters of public concern involves inquiry into the 'content, form and context' of a given statement." *Piver,* 835 F.2d at 1079 (cita-

tions omitted). The Fourth Circuit's elaboration on this "public concern" test is as follows:

[A]ll public employee speech that by content is within the general protection of the first amendment is entitled to at least qualified protection against public employer chilling action ... The focus is ... upon whether the "public" or the "community" is likely to be truly concerned with or interested in the particular expression.

*Berger v. Battagalia,* 779 F.2d 992, 998–99 (4th Cir.1985).

The court need not tarry long with this issue. The political speech that the deputies charge caused their demotions must be given the highest constitutional protection. The First Amendment activity that the plaintiffs engaged in was their active support for the political candidate they perceived as superior.[10] Recognizing that "[s]peech concerning public affairs ... is the essence of self-government" *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964),[11] the court is especially sensitive to safeguarding participation in campaigns since "political elections ... are absolutely dependent upon the free exchange of ideas that lies at the core of the first amendment."[12] Therefore, the court finds that the speech is on a matter of public concern and is constitutionally protected.[13]

---

9. *Waters v. Chaffin,* 684 F.2d 833, 837 n. 9 (11th Cir.1982).

10. The breadth of the First Amendment protection in this area is expansive. Citizens are allowed "not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer v. Grant,* — U.S. —, —, 108 S.Ct. 1886, 1893, 100 L.Ed.2d 425 (1988).

11. The Supreme Court has frequently reaffirmed that speech on public issues occupies "the highest rung of the hierarchy of First Amendment values," and is entitled to special protection. *Connick,* 461 U.S. at 145, 103 S.Ct. at 1689; *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982); *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980).

12. L. Tribe, *American Constitutional Law* 1131–32 (2d ed. 1988).

13. Relying on the decision of *Rankin v. McPherson,* — U.S. —, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), defendants contend that it was not "clearly established" that Sheriff Gondles' actions would violate the plaintiffs' constitutional rights.

Defendants argue that, under the *Rankin* decision, the Supreme Court established that a public employee's speech on a matter of public concern made in private is entitled to constitutional protection. Therefore, defendants assert, a reasonable public official in Sheriff Gondles' position would have concluded that personnel actions based on plaintiffs' public expression would not necessarily violate their clearly established constitutional rights.

The court finds the defendants' argument unpersuasive. The facts before the Supreme Court in *Rankin* are easily distinguishable from the case at bar. The speech in the earlier case involved a private utterance made after the attempted assassination of President Reagan to

## 2. Sheriff's Interest in Promoting an Efficient Workplace

The second prong of the constitutional balancing requires a thorough review of the interests the Sheriff has in "the effective and efficient fulfillment of his responsibilities to the public." *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691.[14] An employer can consider a wide range of workplace disruptions that might arise as a result of an employee's speech. Several of these are of particular importance to a law enforcement official. These include "discipline and harmony in the workplace, confidentiality, protection from false accusations that may prove difficult to counter given the employee's supposed access to inside information ... and protection of close working relationships that require loyalty and confidence." *Piver*, 835 F.2d at 1081 (citing *Pickering v. Board of Education*, 391 U.S. 563, 568–73, 88 S.Ct. 1731, 1734–37, 20 L.Ed.2d 811 (1968)).

In fact, the law enforcement employment relationship, as compared with other work environments in government, allows for a lesser degree of protection for the free speech rights of workers. "[N]onpolicymaking employees can be arrayed on a spectrum, from university professors at one end to policemen at the other. State inhibition of academic freedom is strongly disfavored ... In polar contrast is the disciplined demanded of, and freedom correspondingly denied to[,] policemen." *Jurgensen v. Fairfax County*, 745 F.2d 868, 880 (4th Cir.1984). Nevertheless, even in a sheriff's office, "[t]he interest of the employer in maintaining efficiency in the rendition of public services will vary substantially with the nature of the employment relationship." *Joyner v. Lancaster*, 815 F.2d 20, 23 (4th Cir.1987).

The *Joyner* case provides the latest analysis of the leeway given a sheriff in limiting the free speech freedoms of his employees. Joyner was a Captain in a North Carolina Sheriff's Department serving Sheriff Lancaster. During Lancaster's re-election campaign, Joyner supported the Sheriff's opponent. His actions included distributing campaign literature, putting up yard signs and soliciting people to vote for Lancaster's opponent. Nonetheless, the Sheriff was re-elected and Joyner was subsequently discharged. The Fourth Circuit examined Joyner's role in the office and found that he had "only two supervisors," played "an important role in the implementation of the Sheriff's policies" and was "an essential link between the Sheriff and the Deputies whom he supervised." *Id.* at 24.

It is difficult to find that any of the plaintiffs were "highly placed official[s] in a para-military unit." *Id.* In *Joyner*, the discharged captain had only two supervisors, while the organizational chart for the Sheriff's office indicates that all of the plaintiffs are at least four levels below Sheriff Gondles.

In the case at hand, Deputies Pierson and Tanner are sergeants and supervise several other deputies. Nevertheless, the Sheriff has failed to present sufficient evidence that they are highly placed or that their positions are so highly visible that mutual trust and confidence is important.

As for Sean Whitmore, he handled internal investigations within the Sheriff's office. The Sheriff arguably needs to have

the effect that "if they go for him again, I hope they get him." The Court found that the discharge of the employee who made the statement violated her First Amendment rights. In this case, the Deputies' speech was clearly on a matter of public concern and entitled to first amendment protection. The court is somewhat puzzled by the theory the defendants advance. Since the *Rankin* decision involves an analysis of a public employee's first amendment protections in the context of private speech, the court believes the decision fails to provide the appropriate framework to examine the propriety of the Sheriff's actions. Applicable Supreme Court and Fourth Circuit precedent existed to guide the Sheriff in his decision.

14. At the outset, the court finds that a material dispute exists as to whether the deputies engaged in post-election disruptiveness. The letters of demotion contained no reference to any disruptiveness and the plaintiffs vehemently deny that any occurred. Despite this dispute, the court independently finds that the Sheriff and Chief Deputy Sheriff are entitled to summary judgment on qualified immunity.

trust and confidence in Whitmore's ability to carry out this responsibility.

Robin Whitmore dealt with classification and orientation of the inmates and she occasionally escorted tour groups through the jail. Her position is not sufficiently visible to require the trust and confidence that would be required of other deputies higher in the organization. As for plaintiffs Budd, Lowe and Simonson, their positions are clearly low-level and non-policy-making.

In applying the Fourth Circuit's standard for evaluating the deputies' positions, the court finds that, even though the Sheriff's office is a para-military unit, these deputies, except possibly Sean Whitmore, are not "highly placed official[s]" and do not have "an important role in the implementation of the sheriff's policies." *Joyner*, 815 F.2d at 24.

### 3. *Balancing the Sheriff's Interest and the Deputies' First Amendment Rights*

Whether the action of an employer [15] violates the First Amendment rights of an employee requires a balancing of the employee's interest in the speech against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. The Supreme Court has recognized the difficulty in balancing these seemingly nebulous but obviously significant interests. *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691.

The Fourth Circuit has recently written that this issue "present[s] difficult problems in application" and that the balancing "requires great subtleties of judgment in weighing the conflicting values and interests at stake." *Jackson v. Bair*, 851 F.2d 714, 717 (4th Cir.1988). This case fits well within the quandary recognized by the appellate courts.

The balancing this court must undertake is especially difficult given the fact that both interests at stake are so strong. Few areas of free speech are more protected than political speech in the electoral process. On the other hand, the superior officer in a paramilitary unit is given great leeway to compromise the freedoms of his employees in order to promote discipline.

The speech in this case is undoubtedly protected by the constitution to a greater extent than the speech uttered by law enforcement officers in recent cases decided by the Fourth Circuit.[16] Thus, the court holds that it was clearly established at the time the deputies were demoted that they were entitled to significant protection of their participatory political speech.

The difficulty the court finds with ending the inquiry at this juncture and denying the motion is that the Sheriff had enacted a policy which dealt with the ability of the deputies to criticize the Sheriff and other officers. The linchpin for granting the defendants' motion is this policy. As stated in the manual, Deputy Sheriffs are prohibited from "publicly criticiz[ing] other officers or office operations." *Arlington*

---

**15.** Defendants contend that courts are in conflict as to whether a demotion rather than a discharge can constitute a violation of a public employee's First Amendment rights. The court sees little merit in this contention. The decision in *DeLong v. United States*, 621 F.2d 618 (4th Cir.1980) set forth the inquiry for a trial court in this Circuit to undertake. "The ultimate issue ... is whether ... the challenged reassignment and transfer can reasonably be thought to have imposed so unfair a choice between continued employment and the exercise of protected beliefs and associations as to be tantamount to the choice imposed by threatened dismissal." *Id.* at 624. *But see Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir.1987) (Protection from retaliation for exercise of first amendment rights extends to discipline falling short of discharge.)

The Deputies were placed in the difficult position of either accepting positions which clearly had less status and responsibility or facing the loss of permanent employment. This situation undoubtedly had a chilling effect on their right to participate in the political campaign. Thus, the court finds that the plaintiffs were given a "Hobson's choice" that was "tantamount to outright dismissal." *DeLong*, 621 F.2d at 624.

**16.** *See Jurgensen*, 745 F.2d 868 (Police officers providing newspaper reporter with an internal investigation report was not speech on a matter of public concern); *Joyner*, 815 F.2d at 24 (The First Amendment right of a Captain in Sheriff's office to participate in a political campaign is diminished when he has a "personal" interest in supporting the incumbent Sheriff's opponent).

*County Sheriff's Office, Policy and Procedure Manual,* § 0–601, ¶ 9 at 29 (1986).[17]

The court finds that this regulation appears overly broad and vague and may constitute an unconstitutional restriction on freedom of speech. The most apparent problems with the policy are two-fold. First, the regulation fails to take into account that employees at different levels within the sheriff's office are guaranteed different free speech protections. For instance, a low-level non-supervisory employee obviously can criticize a sheriff's office more vigorously than a person in a policy-making supervisory position.

Second, while the Sheriff's papers state that deputies are allowed to support whomever they want in an election,[18] this policy appears to undermine that right almost in its entirety. It is difficult to support a candidate without being critical of the opponent. The decision any voter makes is inherently a criticism of the person who does not receive his support. This is especially true in the instant case where the deputies are supporting the opponent of their present employer.

While this regulation may be constitutionally improper, nevertheless, at the time the Sheriff demoted the Deputies it was not "clearly established" that his actions would violate their constitutional rights. The policy relied on by Sheriff Gondles was apparently promulgated and enforced in the context of several recent Fourth Circuit opinions which have limited the free speech rights of law enforcement employees. *See Joyner,* 815 F.2d at 22–23; *Jurgensen,* 745 F.2d at 880; *Jones v. Dodson,* 727 F.2d 1329 (4th Cir.1984). These cases, especially the *Jurgensen* opinion, allow for far-reaching limitations on the rights and freedoms of individuals employed in "para-military" units. Thus, it was not "clearly established" that the Sheriff's enforcement of a policy prohibiting all public criticism by deputies would violate their constitutional rights. Accordingly, the defendants are entitled to qualified immunity on this issue.

## B. DUE PROCESS CLAIMS

Plaintiffs allege that their demotion by the Sheriff violates their procedural due process rights. Specifically, the deputies claim that the Sheriff failed to follow the procedures outlined in the Sheriff's Department Policy and Procedures Manual.[19]

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed. 2d 548 (1972). As to a property interest in employment, an employee must have "... sufficient expectancy of continued employment to constitute a protected property interest." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). Deputies in Virginia "may be removed from office" by the Sheriff. Va. Code § 15.1–48. As a general proposition, Virginia Deputy Sheriffs have no constitutional rights under the due process clause. *See Hutto v. Walters,* 552 F.Supp. 266 (E.D.Va.1982). The relevant code section further provides that a deputy has no civil service protection and serves at the pleasure of the Sheriff. Since a deputy serves "at the will and pleasure of" the Sheriff, the Deputy does not have any procedural due process protections.[20]

---

**17.** Section 0–601 provides in pertinent part:
The following acts or omissions shall be prohibited by employees of the Sheriff's Office ...
9. Employees shall not publicly criticize other officers or office operations.

**18.** The Arlington County Sheriff's Office Policy and Procedure Manual does not explicitly bar Deputy Sheriffs from endorsing candidates for local or state office.

**19.** Defendants argue that the plaintiffs' due process claim is not properly plead. Under the liberal notice pleading practice in federal court, a complaint only needs to afford the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The court finds that the due process claims are adequately plead.

**20.** The court notes that procedural requirements of due process also apply to the deprivation of any liberty interest an employee may assert.

**416**

Plaintiffs contend that their due process rights arise from a deprivation of their "liberty" interest as a result of their demotions. They contend that they are non-management level employees of the Sheriff's Department with an expectation of continued employment. As for their status as deputies, plaintiffs claim that this is incidental and of no import to their due process deprivation.

While plaintiffs' contention that they had separate legally recognizable positions—Sheriff Deputies and civilian employees—is both novel and creative, the court fails to find it persuasive. The Constitution of Virginia creates the office of the Sheriff. Art. VII, § 4. As a constitutional officer, the Sheriff is required by statute to fulfill certain duties. To carry out these mandatory duties, a Sheriff is empowered to appoint deputies. The power that a Sheriff has to deputize individuals also gives him the power to dismiss them at his pleasure. A logical extension of this proposition is that the Sheriff can also reassign or demote deputies with impunity.

The great latitude in control over deputies given to sheriffs is obviously a legislative decision made to protect the office. While a Sheriff undoubtedly might be able to create policies as to how he might treat his Deputies, he obviously cannot compromise the statutory-based power to remove or demote them. Simply put, plaintiffs were appointed as Deputy Sheriffs pursuant to Virginia Code and they can be removed or demoted pursuant to that same Code.[21] Accordingly, it was not "clearly established" that the defendants' actions would violate the Deputies' due process rights.

### Conclusion

For the reasons set forth above, it was not "clearly established" that demoting the plaintiffs once their terms expired would compromise their constitutional rights.

An appropriate Order shall issue.

---

**21.** Even if the plaintiffs might somehow be able to assert a due process claim under the theory they have proffered, defendants are still entitled to summary judgment. For the purposes of qualified immunity, it would not have been "clearly established" that the plaintiffs would be entitled to any procedural protections.